# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ZAKIRJAN, | |
| Petitioner, | |
| v. | Civil Action No. 05-2053 (HHK) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

## RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONER'S MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION BARRING TRANSFER OR RELEASE OR REQUIRING ADVANCE NOTICE OF TRANSFER OR RELEASE

Respondents hereby respond to petitioner's motions for a temporary restraining order and preliminary injunction barring his transfer or release from Guantanamo or requiring respondents to provide the Court and petitioner's counsel with advance notice of any transfer or release from Guantanamo (dkt. nos. 5, 8). Petitioner's motions should be denied for the reasons set forth herein.[1] Moreover, petitioner's filing of a second, follow-up motion, seeking a temporary

---

[1] This Court has previously granted similar motions brought by Guantanamo detainees detained as enemy combatants on the basis that Fed. R. App. P. 23(a) requires advance notice of any transfer. See, e.g., Abdah v. Bush, Civ. A. No. 04-1254(HHK), 2005 WL 711814, *5 (D.D.C. Mar. 29, 2005), notice of appeal filed, D.C. Cir. No. 05-5224, (May 31, 2005). Other Judges of this District ruling on similar motions after this Court's decision in Abdah, however, have reached divergent results, with a number of Judges denying relief in whole or in part. Compare, e.g., Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court of any decision to transfer a particular individual to a particular country), with Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL), slip op. (D.D.C. Sept. 1, 2005) (same).

restraining order on the basis of feigned emergency, was entirely unnecessary because, as

petitioner concedes in that motion, respondents' counsel had advised petitioners' counsel that

there was no reason this matter could not be briefed and dealt with on a normal preliminary

injunction schedule.

## BACKGROUND

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, <u>see</u> Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.    Combatant Status Review Tribunals**

Beginning in the summer of 2004, the Department of Defense convened Combatant

Status Review Tribunals ("CSRTs") to review the enemy combatant status of each detainee at

Guantanamo.  During the CSRT proceedings, the detainees were provided with notice of the

factual basis for their classification as enemy combatants, they were allowed to present evidence

on their own behalf, and the tribunal members then made an independent determination as to

whether the detainees should continue to be designated as enemy combatants.[2]  If an individual in

---

[2] <u>See</u> <u>generally</u> July 7, 2004 Order Establishing Combatant Status Review Tribunal, available online at <<http://www.defenselink.mil/news/Jul2004/d20040707review.pdf>>; July
(continued...)

the custody of the Department of Defense at Guantanamo is determined to be no longer classified as an enemy combatant, the government releases that individual as soon as practicable.

Petitioner alleges, and respondents hereby confirm, that he was determined in his CSRT to be no longer classified as an enemy combatant. Thus, respondents are actively engaged in efforts to determine an appropriate destination country so that the necessary arrangements can be made with that country to enable petitioner to be released pursuant to the procedures described below.

## C.    Transfers of Guantanamo Detainees for Release

Because the detainees at Guantanamo are foreign nationals, a release involves transferring the detainee to another country, including most typically his home country. See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3.[3] In any transfer, a key concern is whether the foreign government

_____

[2](...continued)
29, 2004 Memorandum re: Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Naval Base, Cuba, available online at <<http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf>>.

[3] The June 2, 2005 Waxman Declaration submitted herewith replaced and superseded two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases, including Abdah. See Waxman Decl. ¶ 1. While the declaration is written broadly to address all transfer scenarios involving individuals detained by the Department of Defense at Guantanamo (including transfers of individuals confirmed to be enemy combatants), the policies and practices described therein for addressing concerns about possible treatment of an individual after transfer or repatriation are equally applicable to transfers for release of individuals determined to no longer be enemy combatants. In addition, information in the declaration concerning the number of individuals transferred is subject to updating. As of November 2, 2005, 247 detainees have been transferred by the Defense Department from Guantanamo, of which 179 were transferred for release. See Department of Defense Press Release, "Detainee Transfer Announced," Oct. 1, 2005, available at <<http://www.defenselink.mil/news/detainees.html>>.

will treat the detainee humanely and in a manner consistent with its international obligations.

Declaration of Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2;[4]

Waxman Decl. ¶¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee

to a country where the United States believes it is more likely than not that the individual will be

tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is

undertaken, typically involving the Department of State, in which appropriate assurances

regarding the detainee's treatment are sought from the country to whom the transfer of the

detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense

approves a transfer and requests the assistance of the Department of State, the Department of

State initiates transfer discussions with the relevant foreign government.  Waxman Decl. ¶ 6;

Prosper Decl. ¶ 6.  Such discussions include an effort to obtain assurances that the United States

Government considers necessary and appropriate for the country in question, including

assurances of humane treatment and treatment in accordance with the international obligations of

the foreign government accepting transfer.  Id.  Among other things, the Department of State

considers whether the nation in question is a party to relevant treaties such as the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

_____

[4] The Prosper Declaration submitted herewith was originally submitted in Abdah.
Ambassador Prosper left office on or about October 11, 2005, but the policies and practices set
forth in his March 8 declaration remain in effect and are applicable to the instant case.  Again,
while the declaration is written broadly to address all transfer scenarios involving transfers of
individuals detained by the Department of Defense at Guantanamo (including transfers of
individuals confirmed to be enemy combatants), the policies and practices described therein for
addressing concerns about possible treatment of an individual after transfer or repatriation are
equally applicable to transfers for release of individuals determined to no longer be enemy
combatants.  The information in the declaration concerning the number of individuals transferred
is subject to updating.  See supra n.3.

4

more specific assurances if the nation concerned is not a party or other circumstances warrant.
Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government – including, where applicable, evaluation of foreign government assurances – involves senior level officials and may take into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7. The Department of State develops its recommendations through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the Department of State's annual Country Reports on Human Rights Practices) and the relevant Department of State regional bureau, country desk, or U.S. Embassy. Prosper Decl. ¶ 7.[5] When evaluating the adequacy of assurances, Department of State officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its

_____

[5] It is important to note that the Country Reports on Human Rights Practices are relevant but not necessarily dispositive in assessing whether it is more likely than not that a particular individual faces a likelihood that he will be tortured by a receiving foreign government. For example, the Country Reports may describe problems that are confined to a particular facility or component of a government, may reflect certain types of fact patterns that are not applicable to the situation at hand, or may raise concerns that can be appropriately addressed through assurances from the receiving government and, in appropriate cases, monitoring mechanisms. Thus, the fact that a Country Report on Human Rights Practices discusses issues with respect to a country does not per se make that country forever off-limits as a potential repatriation or transfer destination.

5

assurances to the United States.[6] Prosper Decl. ¶ 8. In an appropriate case, the Department of

State may consider various monitoring mechanisms for verifying that assurances are being

honored. Id. If a case were to arise in which the assurances obtained from the receiving

government were not sufficient when balanced against treatment concerns, the United States

would not transfer a detainee to the control of that government unless the concerns were

satisfactorily resolved. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8. Indeed, circumstances have arisen

in the past where the Department of Defense decided not to transfer detainees to their country of

origin because of mistreatment concerns. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

## ARGUMENT

**I.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION/
TEMPORARY RESTRAINING ORDER**

It is well-established that a request for preliminary injunctive relief "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton,

391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a

---

[6] Diplomatic sensitivities surround the Department of State's communications with
foreign governments concerning assurances relating to torture, and the United States' ability to
seek and obtain assurances from a foreign government depends on its ability to treat its dealings
with the foreign government with discretion. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. The United
States Government typically does not unilaterally make public any specific assurances or other
precautionary measures obtained, because such disclosure would have a chilling effect on and
cause damage to our ability to conduct foreign relations. Prosper Decl. ¶ 9. Disclosure of
communications with a foreign government relating to particular mistreatment or torture
concerns outside appropriate Executive Branch channels may cause that government and
potentially other governments to be reluctant to communicate frankly with the United States
concerning such issues in the future. Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. As a result,
disclosure could impede our country's ability to obtain vital cooperation from concerned
governments with respect to military, law enforcement, and intelligence efforts related to the war
on terrorism. Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

6

movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would

suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be furthered by

the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

　　　　In particular, the irreparable harm that must be shown to justify a preliminary injunction

"must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time; the party seeking injunctive

relief must show that the injury complained of is of such imminence that there is a clear and

present need for equitable relief to prevent irreparable harm." Id. (citations and internal

quotation marks omitted; emphasis in original).[7]

　　　　The same factors that apply to a motion for preliminary injunction also govern the

issuance of temporary restraining orders. Vencor Nursing Ctrs. v. Shalala, 63 F. Supp. 2d 1, 7

n.5 (D.D.C. 1999).

---

　　[7] Some Judges of this Court have entered the functional equivalent of preliminary
injunctive relief as a component of a stay of proceedings pending related appeals. However, as
Judge Bates concluded, "if the petitioners cannot meet the prerequisites of a motion for
preliminary injunction . . . it is unlikely that they should receive that same relief through the
backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of
North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).
Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might
be embodied, petitioner should be required to satisfy the preliminary injunction standard in order
to justify that relief.

## II.    PETITIONERS FAIL TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

This Court has previously found irreparable harm in the prospect that a repatriation or

transfer of Guantanamo detainees out of United States custody would "effectively extinguish

those detainees' habeas claims by fiat." Abdah, 2005 WL 711814, at *4. Respondents

respectfully ask the Court to revisit this finding (a) in light of the subsequent analysis by other

Judges confronted with the same issue, and (b) in particular because this petitioner has been

determined to no longer be classified as an enemy combatant, meaning that the only type of

transfer would be a transfer for release, as described in the accompanying declarations.[8] The

ultimate relief sought by petitioner in this habeas case is obviously release from custody. Any

right to challenge the legality of one's detention through a habeas proceeding cannot reasonably

extend so far as to require that detention be continued, after the Executive determines that the

military rationales for enemy combatant detention no longer warrant such custody, for no reason

other than to be able to test the legitimacy of detention the Executive no longer is interested in

---

[8] To be clear, a transfer for release would consist of, in the first instance, a transfer to the control of the government of the destination country. See Waxman Decl. ¶ 3 ("a detainee may be transferred to the control of another government for release"). This is necessary because sovereign nations have borders and any transfer must be coordinated with the foreign government concerned. The United States is not in a position to transport individuals to foreign countries and introduce them into civil society there without the involvement of the government concerned. Even though the foreign government is not (and could not be) constrained from engaging in its own law enforcement efforts, such a transfer is, of course, with the understanding that from the perspective of the United States, release would be appropriate. Petitioner's rhetoric that respondents are "contemplating removal of Petitioner from Guantanamo to foreign territories for torture or indefinite imprisonment without due process of law" (Petr's PI Mot. at 1) is thus nonsensical and incoherent.

maintaining.[9]  "The ultimate objective of a habeas petition is release from custody." Almurbati,

366 F. Supp. 2d at 78.  As Judge Walton found, "once the respondents release the petitioners

from United States custody . . . they will have obtained the result requested and at that point there

will be no further need for this Court to maintain jurisdiction." Id. at 80; see also Al-Anazi, 370

F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining

release from detention, and where, as here, the United States will relinquish custody of the

detainee to the home government there is nothing more the Court could provide to petitioners."

(citation omitted)).

  **B.**  **Speculation that the United States Will Defy its Own**
     **Policy by Transferring Detainees to Countries in**
     **Circumstances Where it is Believed They Will be Tortured**
     **Does Not Warrant a Preliminary Injunction**

   Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . .

actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by

rife speculation that, contrary to the policies and processes attested to in the sworn declarations

of high-level Executive Branch officials, the United States has designs to send petitioner – who

has been determined to no longer be classified as an enemy combatant – to a foreign country in

---

   [9] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  As Judge Bates noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 3 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

circumstances where he will be tortured.  Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer any detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  This policy is implemented through a process that contains several levels of precautions and safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext.  There is no valid basis for such an assumption.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit."  Almurbati, 366 F. Supp. 2d at 78.  Moreover, Judge Bates found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases – including petitioner here – failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo."  Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioner has failed to meet his burden of showing that either the prospect of release from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

10

III.    **PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS
IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
IN ACCORDANCE WITH THE POLICIES EXPRESSED IN
RESPONDENTS' DECLARATIONS**

Petitioner fares no better on the second prong of the preliminary injunction analysis,

which requires him to show that he is likely to succeed, following notice, in preventing a transfer

from Guantanamo.  To be clear, whatever the merits of the issues currently before the D.C.

Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals

docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee

Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-

5064 et al. (D.C. Cir.), and of petitioner's claim that he is being unlawfully detained, it is not the

likelihood of success on those issues or claims that matters for purposes of the instant motion for

preliminary injunction.  Rather, the likelihood of success analysis must focus on the legal basis

for petitioner to obtain an order preventing termination of detention by the United States in the

manner described in the declarations submitted herewith.  As this Court previously held, "if there

are no circumstances under which Petitioners could obtain a court order preventing a

contemplated transfer, a preliminary injunction should not be granted." Abdah, 2005 WL

711814, at *4 (emphasis in original).  Accord Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he presence

of a sound basis to challenge the legality of one's detention does not at all imply that there exists

a sound basis to challenge the legality of one's transfer.  Put differently, the 'merits,' if you will, to

be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners'

challenge to their transfer from Guantanamo, not to their detention at Guantanamo (emphasis in

original)).