A.    **No Valid Legal Basis Exists for a Judicial Order
      Enjoining Transfer or Repatriation of an Individual
      Being Released Upon a Determination That He is No
      Longer an Enemy Combatant**

Petitioner relies solely on Fed. R. App. P. 23(a) as a putative legal basis for the order

barring a transfer that he claims he would be likely to succeed in obtaining.  This reliance is

misplaced for two reasons.  First, Fed. R. App. P. 23(a) does not even apply to this case in its

present procedural posture, because, unlike in <u>Abdah</u>, there is no decision in this case that is on

appeal, as required by the plain language of the Rule.  <u>See</u> Fed. R. App. P. 23(a) (applying

"[p]ending review of a decision in a habeas corpus proceeding" and only to "the prisoner" in

whose proceeding that decision was made); <u>see also</u> Fed. R. App. P. 1(a)(1) ("These rules govern

procedure in the United States courts of appeals."); Order dated May 3, 2005, in <u>Battayav v.

Bush</u>, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R. App. P. 23(a) argument in

case that, like this one, did not have a pending appeal); <u>see also</u> <u>Al-Anazi</u>, 370 F. Supp. 2d at 199

n.11 ("The Court notes that petitioners did not even attempt to argue in their papers that Federal

Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas

petition is not presently on appeal.").[10]

Second, even if Federal Rule of Appellate Procedure 23(a) could somehow be deemed to

find application here notwithstanding the absence of any decision in this case that is on appeal,

that Rule does not apply to a situation in which the United States relinquishes custody of an

individual altogether.  Respondents appreciate that this Court previously held that Fed. R. App.

---

[10] The fact that now pending before the D.C. Circuit are habeas cases brought by other
Guantanamo detainees does not somehow convert this case into one that is somehow deemed
constructively on appeal or otherwise governed by the Federal Rules of Appellate Procedure.

P. 23(a) barred transfer of confirmed enemy combatant detainees whose habeas cases had decisions pending on appeal. See Abdah, 2005 WL 711814, at *5. This case, however, in addition to not having a pending appeal, involves an individual who has been determined to no longer be classified as an enemy combatant, of whom any transfer would be a transfer for release, as described in the attached declarations. In any event, respondents respectfully urge the Court to reconsider its prior interpretation of Rule 23(a), particularly in light of Judge Bates' conclusion in another Guantanamo detainee case that "[n]othing in the Rule indicates a desire to extend it to situations where the United States (or a state) is transferring an individual out of federal or state custody entirely." O.K. v. Bush, 377 F. Supp. 2d 102, 116 (D.D.C. 2005). Rule 23(a) is designed to ensure that, in situations where a prisoner is transferred from one custodian subject to federal habeas jurisdiction to another custodian subject to federal habeas jurisdiction, but remains in the custody of the United States (or relevant state thereof), the court is able to appropriately substitute the successor custodian as the respondent. See Fed. R. App. P. 23(a) ("the court, justice, or judge rendering the decision under review may authorize the transfer and substitute the successor custodian as a party"); Wood v. United States, 873 F. Supp. 56, 57 (W.D. Mich. 1995) (declining to adopt expansive construction of Rule 23(a) where "the purposes of Rule 23(a) would not be furthered," which purposes are "reflected in the provisions of the rule for substituting the successor custodian as a party"). Critically, nothing in Rule 23(a), nor any other provision of law, operates to restrict the United States from relinquishing custody of an individual, which, after all, is the ultimate object of a habeas corpus case. See O.K., 377 F. Supp. 2d at 116-17; cf. Brady v. United States Parole Comm'n, 600 F.2d 234, 236 (9th Cir. 1979) (Rule "does not touch upon release" by government).

In light of its focus on "substitut[ing] the successor custodian as a party," Fed. R. App.

Proc. 23(a), the Rule should not be read to cover situations that involve not a transfer from one

United States custodian to another United States custodian, but rather a relinquishment of United

States custody altogether in connection with a transfer or repatriation to a foreign nation for

release. In that situation, there is no "successor custodian" subject to federal habeas jurisdiction

who could be substituted as a party.[11] See O.K., 377 F. Supp. 2d at 116 (noting that petitioners'

interpretation of the word "another" to include a foreign government "immediately runs into

difficulty in the next sentence of the Rule"). Moreover, upon relinquishment of United States

custody, the relief available in habeas would have been received and the habeas case therefore

would be moot, making substitution of a successor custodian unnecessary.

Indeed, until this Court's prior decision in Abdah, 2005 WL 711814, our research has not

uncovered any case where Federal Rule of Appellate Procedure 23(a) has been held to apply to

the transfer of a detainee to a foreign country for release and concomitant relinquishment of

custody by the United States, even assuming arguendo that petitioner could be considered a

"prisoner" within the meaning of the Rule. Rather, Rule 23(a) cases have involved transfers from

one United States (or state) custodian to another United States (or state) custodian where the

prisoner remained in the custody of the United States (or state authorities). See, e.g., Goodman

v. Keohane, 663 F.2d 1044, 1047 (11th Cir. 1981) (involving transfer from federal correctional

facility in Miami, Florida to a federal penitentiary in Terre Haute, Indiana); see also Brady, 600

---

[11] This is so regardless of whether the foreign nation to which the former Guantanamo detainee is repatriated or transferred may itself detain the individual as a function of its own law enforcement, criminal justice, or other interests, as would be its prerogative. Neither respondents, nor this Court, are in a position to confer upon ex-detainees some kind of worldwide immunity from law enforcement by other sovereign governments.

F.2d at 236 (Rule 23 "was promulgated to alleviate jurisdictional problems sometimes created by geographical limits on habeas corpus jurisdiction"). As Judge Bates held, in light of the "well-settled canon of statutory interpretation providing that a court should not construe a statute to interfere with the province of the Executive over military affairs in the absence of a clear manifestation of Congressional intent to do so," these cases involving detainees captured in the course of ongoing military hostilities do not present an appropriate occasion for indulging a creative interpretation that "would transform a technical and procedural rule that addresses the identity of the parties in a habeas proceeding into a sweeping prohibition on the transfer and release of military detainees while a case is on appeal." O.K., 377 F. Supp. 2d at 117 (citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988)).

The Court should also be mindful of the practical implications of extending its Fed. R. App. P. 23(e) analysis in Abdah to the situation of detainees who are slated for release based on determinations that they are no longer classified as enemy combatants and in whose cases there has been no decision awaiting appellate review. As discussed above, for diplomatic and logistical reasons, any release of a foreign national detained at Guantanamo but determined no longer be classified as an enemy combatant necessarily involves, in the first instance, a transfer to the control of the government of the destination country. See supra note 8. If Fed. R. App. P. 23(e) were construed to cover such situations, it would thus effectively impose a requirement of affirmative court approval for the release of detainees whom the Combatant Status Review Tribunals have already determined shall no longer be classified as enemy combatants. Whatever may be the appropriate application of Fed. R. App. 23(a) to confirmed enemy combatants as in Abdah, there is no warrant for reading "a technical and procedural" (O.K., 377 F. Supp. 2d at

117) rule of appellate procedure to dictate such an extraordinary result in a case that is not even on appeal.

**B.    Separation-of-Powers Principles Militate Heavily Against Petitioner's Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in the transfer or repatriation of individuals formerly detained by the Military as enemy combatants, or for an advance notice requirement to support and facilitate such involvement, the separation of powers would bar such relief. "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch." People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383 (1959)).[12] If the Court were to entertain petitioner's claim to a right to contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters. Judicial review of a transfer or repatriation decision could involve scrutiny

---

[12] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

of United States officials' judgments and assessments on the likelihood of torture in a foreign
country, including judgments on the reliability of information and representations or the
adequacy of assurances provided, and confidential communications with the foreign government
and/or sources therein. Prosper Decl. ¶¶ 9-12. Disclosure and/or judicial review of such matters
could chill important sources of information and interfere with our ability to interact effectively
with foreign governments. Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8. In particular, the foreign
government in question, as well as other governments, would likely be reluctant to communicate
frankly with the United States in the future concerning torture and mistreatment concerns.
Prosper Decl. ¶¶ 10, 12. This chilling effect would jeopardize the cooperation of other nations in
the war on terrorism. Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

 Because of these foreign relations implications, as developed most extensively in the
analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a
requesting nation's justice system'" and "'the procedures or treatment which await a surrendered
fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.
1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));
see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the
extradition context" "counsel[s] even further against judicial interference"). This principle is
sometimes called the Rule of Non-Inquiry. For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d
Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial
for an alleged terrorist attack. While the district court upheld the extradition only after receiving
testimony and extensive documentation concerning Israel's law enforcement system and
treatment of prisoners, the Second Circuit held that such inquiry was wholly improper. "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." Id. at 1067. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch" (internal quotation marks omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61 (E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of release from Guantanamo, rather than merely trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[13] See

---

[13] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is narrowly limited to extradition cases, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. Kin-Hong, 110 F.3d at 111 n.12. In that later
(continued...)

Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess any Executive judgments about matters such as custodial conditions or the adequacy of legal procedures in a foreign country, nor the credibility and adequacy of a foreign government's assurances. Cf.

---

[13](...continued)
case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to move him out of Guantanamo would be pursuant to an extradition treaty or statute, such a contention would lead to the absurd result that he could not be released unless some other country sought him for purposes of initiating a law enforcement proceeding against him. In any event, that contention would be wholly without merit. See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for

which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to

belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting

Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming

transfer or repatriation in order to enable petitioner to seek a judicial order blocking it.  Neither

the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of

ordering custody that the United States wishes to relinquish to nevertheless be artificially and

indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the

absence of affirmative legal authority, separation of powers considerations and foreign relations

sensitivities preclude a judicial inquiry in which this Court would substitute its judgment

regarding the appropriateness of transfer or repatriation for that of the appropriate Executive

Branch officials.

IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE
       WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to

seek an order blocking a transfer or repatriation decision that the Executive would already have

made after consultation and coordination with the foreign government in question.  See Petr's PI

Mot. at 9 (stating that purpose of advance notice is so that petitioner is "provided with a

meaningful opportunity to contest his transfer" in federal court); Petr's TRO Mot. at 2

("contest[ing] the legality of such a transfer" is "precisely the relief sought by the pending

20

Preliminary Injunction motion"). Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section III.B (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers. These harms weigh heavily against entry of a preliminary injunction.

## V.     AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions and to engage in foreign relations, to act

without undue intrusion within its constitutional sphere of responsibility.  Petitioner may invoke

truisms such as that the public interest disfavors torture, but that aspect of the public interest is

already well served by the existing policies and processes governing transfers and repatriations of

Guantanamo detainees, as described in the accompanying declarations.[14]  As Judge Bates held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

---

[14] While this Court held in Abdah that "this factor tilts in Petitioners' favor, because the
public has a strong interest in ensuring that its laws do not subject individuals to indefinite
detention without due process," 2005 WL 711814, at *6 (emphasis added), here, the government
intends to release petitioner as soon as the appropriate destination country can be determined and
necessary arrangements made with that country.  And, to the extent petitioner subsequently, if
ever, becomes subject to law enforcement or detention in a country to which he is transferred,
that would be a function of that country's laws, not the laws of the United States or its public.
Moreover, the proposition that "[i]t is always in the public interest to prevent the violation of a
party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071,
1079 (6th Cir. 1994), begs the question what violations of constitutional rights (assuming
arguendo that enemy aliens detained at Guantanamo possess rights under the United States
Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or
imminent here and stand to be prevented by an injunction.  As discussed above, respondents'
policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not
violate any rights petitioner may have, constitutional or otherwise.  The public interest surely
does not support assuming without any foundation that Executive Branch officials are wont to
engage in constitutional violations unless supervised by the courts.

22

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motions

for a temporary restraining order and for a preliminary injunction be denied.

Dated: November 3, 2005                         Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                KENNETH L. WAINSTEIN
                                                United States Attorney

                                                DOUGLAS N. LETTER
                                                Terrorism Litigation Counsel


                                                  /s/ Robert J. Katerberg
                                                JOSEPH H. HUNT (D.C. Bar No. 431134)
                                                VINCENT M. GARVEY (D.C. Bar No. 127191)
                                                TERRY M. HENRY
                                                JAMES J. SCHWARTZ
                                                PREEYA M. NORONHA
                                                ROBERT J. KATERBERG
                                                ANDREW I. WARDEN
                                                NICHOLAS J. PATTERSON
                                                Attorneys
                                                United States Department of Justice
                                                Civil Division, Federal Programs Branch
                                                20 Massachusetts Ave., N.W.
                                                Washington, DC  20530
                                                Tel:  (202) 514-4107
                                                Fax:  (202) 616-8470

                                                Attorneys for Respondents

23