# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
─────────────────────────────
MAJID ABDULLA AL-JOUDI,          :
et al.,                          :
                                 :
                                 :
       Petitioners,              :
                                 :
       v.                        :      Civil Action No. 05-301 (GK)
                                 :
GEORGE W. BUSH, et al.,          :
                                 :
       Respondents.              :
─────────────────────────────    :
JARALLAH AL-MARRI,               :
et al.,                          :
                                 :
                                 :
       Petitioners,              :
                                 :
       v.                        :      Civil Action No. 04-2035 (GK)
                                 :
GEORGE W. BUSH, et al.,          :
                                 :
       Respondents.              :
─────────────────────────────    :
MUHAMMAD AL-ADAHI,               :
et al.,                          :
                                 :
                                 :
       Petitioners,              :
                                 :
       v.                        :      Civil Action No. 05-280 (GK)
                                 :
GEORGE W. BUSH, et al.,          :
                                 :
       Respondents.              :
─────────────────────────────    :
HAMID AL RAZAK,                  :
et al.,                          :
                                 :
                                 :
       Petitioners,              :
                                 :
       v.                        :      Civil Action No. 05-1601 (GK)
                                 :
GEORGE W. BUSH, et al.,          :
                                 :
       Respondents.              :
─────────────────────────────    :
```

MEMORANDUM OPINION

Petitioners originally filed a joint Emergency Motion to Compel Access to Counsel and Information Related to Petitioners' Medical Treatment ("Motion") in the above-captioned cases.  The Court set an expedited briefing schedule and ordered the parties to re-file their briefs with relevant legal authority.  Petitioners then re-filed their Motion as a Preliminary Injunction.  A hearing was held on October 14, 2005.  Upon consideration of the revised Motion, Opposition, Reply, supplemental materials, and arguments made at the Motion Hearing, Petitioners' Motion is **granted in part** and **denied in part.**

## I.   BACKGROUND

Petitioners are citizens of Qatar, Saudi Arabia, Yemen and Afghanistan.   Between, November 2004 and August 2005, they requested immediate issuance of a writ of <u>habeas</u> <u>corpus</u>, challenging their detention at the U.S. Naval Base at Guantanamo Bay, Cuba ("Guantanamo").  The Motion now before the Court arises out of the most recent hunger strike taking place at Guantanamo.

On or around August 25, 2005, Petitioners' counsel learned that the second of two recent hunger strikes had begun at Guantanamo.  According to Petitioners, this hunger strike arose because "(1) military authorities had failed to meet the obligations agreed to in an agreement between detainees and Respondents that had ended a prior hunger strike just two months ago; (2) detainees continue to be subject to physical,

2

psychological and religious abuses; and (3) detainees continue to be held without charge or adequate process." Pets.' Mot. to Compel Access to Counsel and Info. Related to Medical Treatment ("Pets.' Mot.") at ¶ 14.   When Petitioners filed their Motion, they had information that between 131 and 210 detainees were participating in the hunger strike, and that as of September 16, 20 were being "forcibly subject to involuntary medical intervention via the introduction of intravenous fluids or nasoenteric (nasal) tube feeding."  Id. at ¶¶ 15-18.[1]

In light of this information, Petitioners' counsel asked the Government to provide information related to their clients' health status and hospitalization records or, in the alternative, permission to speak with their clients by telephone to ascertain their condition.  Id. at ¶¶ 7-8.  Respondents refused to provide client-specific information, claiming "GTMO is not in a position to provide continuous updates on that situation to you or, potentially, counsel for the more than 200 other habeas petitioners at GTMO.   Similarly, GTMO is not in a position to support telephonic access to the detainees for such purposes.  As noted above, however, GTMO is appropriately monitoring and providing medical treatment to detainees as warranted to preserve detainees'

---

[1]  The Government represented at the Motion Hearing that as of October 14, 2005, only 24 detainees were on hunger strike, and that only a portion of those 24 were being force fed.  Oct. 14, 2005 Hearing Tr. ("Tr.") at 37.

lives and health." <u>Id.</u> at ¶ 32 and Ex. L.    Petitioners subsequently filed this Motion.[2]

Petitioners assert that without judicial intervention, they have no effective means of accessing their clients or ascertaining information about their health status.    Petitioners each seek the same relief from the Court:    1) that representative counsel be granted immediate access to Guantanamo, for the purpose of assessing the medical condition of all Petitioners;    2) that Petitioners' counsel be granted immediate telephone access to their clients;    3) that Petitioners' counsel be granted immediate telephone access to Petitioners' next friends or family members; and    4) that Petitioners' counsel be given access to records regarding Petitioners' medical treatment, meal schedules, punishment and hospitalization, and Respondents' policies and actions taken with respect to the current and previous hunger strikes.    <u>Id.</u> at ¶ 10.

### A.    Al-Joudi Petitioners

Julia Tarver, counsel for the Al-Joudi Petitioners, Majid Abdulla Al-Joudi, Yousef Al Shehri, and Abdul-Rahman Shalabi, submitted a Declaration detailing what she learned during her visit to Guantanamo from September 30 to October 2, 2005.[3]    The

_____

[2]    The Court recognizes that Petitioners' counsel are providing their services on a <u>pro</u> <u>bono</u> basis.    Such <u>pro</u> <u>bono</u> representation, especially in controversial and high profile cases such as these, is in the very finest tradition of the American legal profession.

[3]    The Court is mindful that many of the detainees' statements recounted in counsel's declarations are hearsay.    Counsel's

allegations are deeply troubling, and counsel's concern about the welfare of her clients is understandable. However, it is also true that none of those allegations have been tested in the crucible of cross-examination. If the allegations are true -- and they are all explicitly, specifically, and vigorously denied by the Government -- they describe conduct of which the United States can hardly be proud.

Yousef Al Shehri, who was detained when still a juvenile, was "emaciated and had lost a disturbing amount of weight" since counsel's last visit in July 2005. Suppl. Decl. of J. Tarver at ¶ 7. "He had difficulty speaking because of lesions in his throat that were a result of the involuntary force-feeding he had been receiving through his nose and throat." Id.

Al Shehri informed counsel that with shackles or other restraints on their arms, legs, waist, chest, knees and head, detainees were being force fed by intravenous medication. This process was "often quite painful[] as inexperienced medical professionals seemed incapable of locating appropriate veins." Id. at ¶ 8.

Al Shehri told his counsel that, at some point, he, along with other detainees, started to be force fed through nasogastric tubes that were inserted through the nose, down the throat, and into the stomach. Al Shehri was "given no anesthesia or sedative for the

---

statements regarding personal observations of the medical and emotional state of their clients, however, are not hearsay, are admissible, and are credible.

procedure; instead, two soldier [sic] restrained him -- one holding
his chin while the other held him back by his hair, and a medical
staff member forcefully inserted the tube in his nose and down his
throat.  Much blood came out of his nose . . . he could not speak
for two days . . . [and] he could not sleep because of the severe
pain."  Id. at ¶ 10.  The procedure caused him and other detainees
to vomit "substantial amounts of blood."  Id. at ¶ 11.  "When they
vomited up blood, the soldiers mocked and cursed at them, and
taunted them with statements like 'look what your religion has
brought you.'"  Id.

Al Shehri also told his counsel that he and other detainees
were transferred to a different location in which "the walls were
made of foam, and there were strange lights and a hole in the floor
in which to urinate."  Id. at ¶ 13.  Here the guards began to
insert thicker tubes into the detainees' noses.  When this thicker
tube was removed from Al Shehri's nose, "blood came gushing out of
him.  He fainted, and several of the other detainees also lost
consciousness."  Id. at ¶ 14.  Riot guards forcibly removed these
tubes by "placing a foot on one end of the tube and yanking the
detainee's head back by his hair."  Id. at ¶ 15.

Al Shehri also recounted that "in front of Guantanamo
physicians -- including the head of the detainee hospital -- the
guards took NG tubes from one detainee, and with no sanitization
whatsoever, re-inserted it into the nose of a different detainee .
. . [T]he detainees could see the blood and stomach bile from other

6

detainees remaining on the tubes." Id. at ¶ 16 (emphasis in original).

Petitioners assert that because of this needlessly cruel and painful treatment, Al Shehri "can no longer walk. He has lost some of his vision, and he is vomiting every day . . . [H]e has severe headaches, and great pain in his ear. He is only able to urinate once every few days . . . He has given [] his last will and testament, as he fully anticipates that he is going to die." Id. at ¶ 18.

### B.  Al-Marri Petitioners

Jonathan L. Hafetz, counsel for Petitioner Al-Marri, met with his client on July 26 and 27, 2005. Pets.' Mot. at 6, Ex. J, Decl. of J. Hafetz at ¶ 3. Al-Marri informed him that during June and July 2005, he refused to eat for 17 consecutive days, and that he was hospitalized, connected to an IV, and treated for a serious heart condition. Id. at ¶¶ 4-5. Counsel asserts that Al-Marri has been denied adequate medical care and "presently suffers from a number of medical conditions, including heart, kidney, and bladder problems." Id. at ¶ 14.

During the hearing, counsel represented that Al-Marri has been detained for almost four years, and for two years he has been in "absolute solitary confinement with the lights on 24 hours a day, seven days a week . . . He has lost over 30 pounds, and looks . . . frail, gaunt and disheveled . . . ." Tr. at 64.

### C.   Al-Adahi Petitioners

John Anderson, counsel for Al-Adahi Petitioner Muhammad Ali Abdullah Bawazir, submitted a declaration detailing his visit to Guantanamo in late September 2005. He observed that the floors of Bawazir's cell were inexplicably "sopping wet," and that his "physical appearance had changed so drastically from [the] last meeting in June of 2005 that he was hardly recognizable." Suppl. Decl. of J. Anderson at ¶¶ 5-6. He was so weak that counsel cut short their meeting with him as he was "visibly exhausted and was suffering from the effort of sitting up." Id. at ¶ 11.

During the hearing, John Chandler, who visited Bawazir along with Mr. Anderson, added that it was only upon his arrival at Guantanamo that he learned for the first time that his client was participating in the hunger strike. Tr. at 31. Counsel observed that Bawazir was "shackled . . . to a wheelchair," and shivering, and that he had lost a significant amount of weight. Id.

### D.   Al-Razak Petitioners

Counsel for the Al-Razak Petitioners has not yet received a security clearance, and therefore has been unable to visit his client. He believes, based on information from the press and communications with other counsel, that his client may be participating in the hunger strike. Pets.' Mot. at 7, Ex. K, Decl. of A. Sussman at ¶¶ 2-4.

**E.    The Government's Opposition**

In opposition to Petitioners' Motion, the Government submitted the Declaration of Major General Jay Hood, Commander, Joint Task Force-Guantanamo, Guantanamo Bay, Cuba, to establish that there are adequate procedures in place at Guantanamo to protect detainees' health.    The Declaration states, "our detention mission is conducted in a humane manner that protects the security of both detainees and JTF personnel at GTMO." Resps.' Opp'n to Pets.' Mot. ("Opp'n"), Ex. A, ¶ 1.    It is Guantanamo policy to "prevent unnecessary loss of life of detainees through standard medical intervention, including involuntary medical intervention when necessary to overcome a detainee's desire to commit suicide, using means that are clinically appropriate." Id. at ¶ 2.

This policy involves monitoring each detainee's intake of food and water.    If a detainee misses nine consecutive meals or has refused food and water for more than two days, medical personnel are notified.    Id. at ¶ 5.    If medical personnel determine that continuation of the hunger strike could endanger a detainee's health, or life, the detainee is admitted to the hospital, where he receives continuous observation and counseling regarding the risks of participating in the hunger strike.    Id. at ¶ 6.    "Interventions of an involuntary manner are deferred . . . until there is a clear medical determination by the attending physician that continued fasting would impair the health seriously or jeopardize the life of a detainee."    Id. at ¶ 8.

The Government also submitted the Declaration of Dr. John S. Edmondson, M.D., Commander of the U.S. Navy Hospital at Guantanamo, Task Force Surgeon for Joint Task Force-Guantanamo, and head of the Guantanamo detainee hospital. Dr. Edmondson specifically denies each and every one of Petitioners' allegations regarding the procedures being used to handle the hunger striking detainees.

Dr. Edmondson asserts that nasogastric feeding tubes are inserted only by trained and experienced physicians and credentialed registered nurses.[4] Resps.' Suppl. Opp'n at 3, Ex. A, ¶ 5. He maintains that the tubes are always inserted with a lubricant, and that "in all cases, a topical anaesthetic such as lidocaine is offered." Id. at ¶ 6. In contradiction of Al Shehri's complaints regarding the width of the feeding tubes, Dr. Edmondson states that "[c]urrently only 10 french (3 mm. in diameter) nasogastric tubes are used on all patients."[5] Id. at ¶ 9. He concludes that insertion and removal of feeding tubes is not done "in a manner intentionally designed to inflict pain or harm on the detainee." Id. at ¶ 6.

Dr. Edmondson specifically contests Petitioners' claims about the unsanitary use of feeding tubes. "Current protocols require

---

[4] During the hearing, Ms. Tarver stated that of the medical staff Dr. Edmondson refers to, only two are actually physicians. Tr. at 60.

[5] Dr. Edmondson admits that "[o]riginally, 12 french (3.6 mm in diameter) tubes were used for most detainees receiving daily feedings," and that "[d]uring a two-day period in September 2005, 16 french (4.8 mm in diameter) tubes were used for a few patients." Id. at ¶ 9.

that a new sterile nasogastric tube be utilized for every insertion
. . . Nasogastric tubes are not and were not ever inserted in one
patient and then used again in another patient."[6] Id. at ¶ 8. Dr.
Edmondson states that although "[o]ccasional sores may occur in the
throat . . . [t]he sores have not kept the patients from talking or
otherwise functioning within the camp or the detention hospital,"
and notes that detainees are offered pain relievers if they are in
discomfort. Id. at ¶ 14.

Dr. Edmondson challenges the assertions of Petitioners Al
Shehri and Bawazir. He claims that although both have experienced
"demonstrable weight loss due to their choice to participate in the
hunger strike," their condition is stable and their prognosis is
good. Id. at ¶¶ 17-18.

## II.    STANDARD OF REVIEW

It is undisputed that the granting of preliminary injunctive
relief is an extraordinary measure, and that the power to issue
such exceptional relief "should be sparingly exercised." Dorfmann
v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (internal citation
omitted). To obtain preliminary injunctive relief, a plaintiff has
the burden of demonstrating: "1) a substantial likelihood of
success on the merits, 2) that [plaintiff] would suffer irreparable
injury if the injunction is not granted, 3) that any injunction

---

[6]    Dr. Edmondson admits that "[a]n earlier protocol used in
the detention hospital allowed a sanitized feeding tube to be
reused for the same detainee, only," which was consistent with
standard, approved medical practice, but that practice was changed
after only two days. Id. at ¶ 8.

would not substantially injure other interested parties, and 4) that the public interest would be served by the injunction." <u>Katz v. Georgetown Univ.</u>, 246 F.3d 685, 687-88 (D.C. Cir. 2001). The threat of irreparable injury must be "real and imminent." <u>Getty Images New Servs. Corp v. Dep't of Defense</u>, 193 F. Supp. 2d 112, 122 (D.D.C. 2002) (citing <u>Wisconsin Gas Co. v. F.E.R.C.</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)).

"These factors interrelate on a sliding scale and must be balanced against each other." <u>Serono Labs, Inc. v. Shalala</u>, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak." <u>City Fed. Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 746 (D.C. Cir. 1995).

**III. ANALYSIS**

        **A.    Irreparable Injury**

Petitioners argue that immediate injunctive relief is necessary to "ensure that [they] have access to counsel and the Court." Pets.' Mot. at ¶ 35. Counsel's main argument is that "Petitioners risk death or permanent physical injury due to their participation in the hunger strike -- consequences which may be avoided if they are afforded the opportunity to meaningfully confer with counsel and able to therefore access the Court in order to enforce their rights." <u>Id.</u> at ¶ 39.

The Government responds that "Guantanamo personnel have policies and practices in place for responding appropriately to hunger strikes such that no detainee's life or health will be endangered." Opp'n at 4. The Government further claims that because certain counsel have recently made trips to Guantanamo, or have trips planned in the near future, immediate access to their clients is unnecessary. However, as Petitioners' counsel argued at the hearing, "the access issue is not solved after one visit" since the detainees' conditions vary, and can deteriorate very rapidly. Tr. at 24.

Finally, the Government points out that, thus far, "no one has died." Id. at 43. It goes without saying that this Court need not wait to issue injunctive relief until a detainee has died. It can hardly serve either the national security interests of this country or enhance its image throughout the world to contribute in any way to the death of a detainee in its custody.

Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger. See, e.g., Blackman v. District of Columbia, 185 F.R.D. 4, 6-7 (D.D.C. 1999) (referring to related case in which court found plaintiff had established irreparable harm where defendant was not administering necessary medication and catheterization to child); Wilson v. Group Hosp. & Med. Servs., Inc., 791 F. Supp. 309, 314 (D.D.C. 1992) (granting preliminary injunction where cancer patient's "health and future remain[ed] in

serious doubt" and insurance carrier refused to pay for the only treatment that could save her life).

Although these cases are distinguishable on the facts, they support the proposition that where the health of a legally incompetent or vulnerable person is at stake, irreparable harm can be established. While Petitioners do not lack legal competence as children do, they are indeed vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantanamo and weakened physical condition.

Finally, the Court is cognizant of the fact that Petitioners have voluntarily decided to participate in the hunger strike. Petitioners claim, however, that their voluntary participation is, in fact, a desperate protest against what they perceive as a long, potentially indefinite, confinement without final adjudication of their status.[7] The legal analysis for irreparable harm must focus not on the cause of the injury, but rather on the degree and imminence of harm that will result if the Court does not issue emergency relief.

The Court concludes that Petitioners have provided sufficient facts, based both on counsel's personal observations over a period of time, and the detainees' accounts of their own experiences, to establish that the threat of death or serious physical deterioration is real and imminent, and that Petitioners have

---

[7] The Government suggests that Petitioners have been trained to make false claims of mistreatment if they are captured by their "enemies." Resps.' Suppl. Opp'n at 6 n.5, Ex. B.

satisfied the requirement of facing irreparable harm unless injunctive relief is granted. See Getty, 193 F. Supp. 2d at 122.

## B.    Likelihood of Success on the Merits

Petitioners argue that detainees seeking habeas relief have an established right to "present their own cases," and that courts are "empowered to requir[e] additional measures to assure" that right is provided. Bounds v. Smith, 430 U.S. 817, 824 (1977).    The Government argues in response that there is no adequate legal basis for Petitioners' requested relief. The Government characterizes Petitioners' request as one for judicial oversight of executive policies and procedures at Guantanamo that amounts to nothing more than "second-guessing of the judgment of the military's medical professionals." Opp'n at 12.

In Rasul v. Bush, 124 S.Ct. 2686, 2699 (2004), the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."[8]    The Court noted that the "courts of the United States have traditionally been open to nonresident aliens," id. at 2698, and that none of its prior decisions "categorically exclude[] aliens detained in military custody outside the United States from the 'privilege of litigation' in U.S. courts." Id. (internal quotations and citations omitted); see also id. at 2700 (Kennedy,

---

[8]    The Supreme Court's decision in Rasul made it clear that district court jurisdiction was based on 28 U.S.C. § 2241, the habeas statute, 28 U.S.C. § 1331, the federal question statute, and 28 U.S.C. § 1350, the Alien Tort Statute. Id. at 2692-99.

15

J., concurring) ("there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated").

In order to give meaning to the Supreme Court's decision in Rasul, and to allow Petitioners "the privilege of litigation in the U.S. courts," procedures must be fashioned, as necessary and appropriate, to facilitate Petitioners' access to their counsel and the Court, as well as counsel's access to their clients, so that Petitioners have the tools to "present their own cases."

As Judge Kollar-Kotelly reasoned in Al Odah v. United States, 02-828 (October 20, 2004 Mem. Op. at 8-9), the case law pertaining to both the federal habeas statute and the analogous state habeas statute, 28 U.S.C. § 2254, as well as the All Writs Act, 28 U.S.C. § 1651, "permits this Court to fashion procedures, by analogy to existing procedures, in aid of the Court's jurisdiction and in order to develop a factual record as necessary for the Court to make a decision on the merits of Petitioners' habeas claims."

In Harris v. Nelson, 394 U.S. 286, 299 (1969), the Supreme Court held that "a district court may, in an appropriate case, arrange for proceedings which will allow development . . . of the facts relevant to disposition of a habeas corpus petition."  The Court explained that such proceedings are necessary in order to allow habeas petitioners "careful consideration and plenary process of their claims including full opportunity for presentation of the relevant facts."  Id. at 299.  Relying on the All Writs Act, the Supreme Court ruled that "when the Court considers that it is

16

necessary to do so in order that a fair and meaningful evidentiary hearing may be heard," it "may . . . authorize such proceedings with respect to development . . . of the facts . . . as may be necessary or appropriate in aid of [its jurisdiction]." Id. at 300.

Based on this authority, Judge Kollar-Kotelly reasoned that "Petitioners are entitled to present the facts surrounding their confinement to the Court. It is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to their detention." Al Odah, 02-828 (October 20, 2004 Mem. Op. at 10). She then concluded that the District Court has the authority to appoint counsel to represent habeas petitioners.

It follows that in order to properly represent Petitioners, their counsel must have access to them, must be able to communicate with them, and must be made aware if their clients are in such fragile physical condition that their future ability to communicate is in imminent danger. In Battle v. Armontrout, 902 F.2d 701, 702 (8th Cir. 1990), the Eighth Circuit concluded that a petitioner appealing a state habeas ruling was entitled to be represented by counsel because his ability to investigate the facts was "seriously impaired by his incarceration," and "the factual and legal issues [were] sufficiently complex" that counsel was necessary "to develop [petitioner's] arguments and focus the court's analysis." Id. at 702.

The reasoning of the Eighth Circuit is directly applicable to the present circumstances. Unless Petitioners' counsel can have access to their clients, and know their true medical conditions, including whether they are in imminent danger of death, so as to counsel them in order to persuade them to stay alive, it is obvious that their ability to present their claims to the Court will be irreparably compromised.

In Bounds, the Supreme Court reaffirmed its prior decisions that "prisoners have a constitutional right of access to the courts," and that such access must be "adequate, effective, and meaningful." 430 U.S. at 821-22. While Bounds dealt with the obligation of prisons to "assist inmates in the preparation and filing of meaningful legal papers through the establishment of adequate law libraries or other means," id. at 828, its underlying principles are applicable here.

In these circumstances in particular, access to the Court means nothing without access to counsel. Petitioners are from foreign countries, most, if not all, have been detained for close to four years, do not speak English, and are in all likelihood totally unfamiliar with the United States legal system. As such, they have "no alternative form of legal assistance available to them." Id. at 823 (citing Johnson v. Avery, 393 U.S. 483 (1969)). In sum, access to counsel by Petitioners is illusory unless counsel have sufficient access to their clients to be informed about their current physical condition.

18

For all these reasons, the Court concludes that Petitioners have a substantial likelihood of success on their access to counsel claims.

### C.    Injury to the Government

The Government has made no representation that the national interest will be threatened or burdened by granting Petitioners certain narrowly tailored relief.[9]  The Court is keenly aware of the logistical burdens associated with monitoring and providing medical care for those participating in the hunger strike. See Tr. at 46-47.  However, considering that, at least as of the day of the hearing, there were only 24 detainees participating in the hunger strike, this logistical burden is simply not substantial when weighed against the irreparable injury Petitioners face.

### D.    Public Interest Concerns

The Court finds the public interest will be served by ensuring that habeas petitioners have access to counsel so that they can meaningfully challenge their detention, and the courts can adjudicate their claims.  While it is true that the "public has a strong interest in assuring that the military operations and medical care provided at Guantanamo are not interrupted, overly-burdened, and second-guessed," Opp'n at 18, and that the courts should not be "in the business of running prisons," Inmates of

---

[9]    The Court agrees with the Government that "immediate in-person access by counsel to all of the petitioners in these cases would impose an unmanageable burden on the staff at Guantanamo," and that "the logistics of arranging a telephone conversation between the detainees and habeas counsel or family members are more burdensome than a direct counsel visit."  Opp'n at 6-8.

Occoquan v. Barry, 844 F.2d 828, 841 (D.C. Cir. 1988), the relief granted herein is narrowly drawn so as not to unduly interfere in the day-to-day operations at Guantanamo, and will cause only minimal clerical burdens to the Government.

## IV. CONCLUSION

The Supreme Court has granted Petitioners the right to challenge their detentions. In order to do so in a meaningful way, they must have access to counsel and to the Court. Such access is particularly necessary where a detainee's life and health are in serious danger. _____

_____Accordingly, balancing the imminent and irreparable harm Petitioners face, as well as their right to counsel, which requires that counsel be able to communicate with them, against the lack of any prejudice to the Government and our national security interests, as well as the minimal burden placed on personnel at Guantanamo, the Court concludes that Petitioners are entitled to the following limited relief:

(1) The Government shall provide notice to Petitioners' counsel within 24 hours of the commencement of any forced feeding of their clients;

(2) For those Petitioners who are being force fed, the Government shall provide to Petitioners' counsel:

a. medical records spanning the period beginning one week prior to the date forced feeding commenced; and

          b.   provision of medical records shall continue, at a minimum, on a weekly basis until forced feeding concludes.[10]

/s/ _____
GLADYS KESSLER
U.S. District Judge

Date:  October 26, 2005

**Copies to:**  Attorneys of Record via ECF

---

[10] Petitioners have also requested that representative counsel be granted immediate access to Guantanamo, for the purpose of assessing the medical condition of all Petitioners.  That request is too broad.  However, counsel for Petitioners and the Government are strongly urged by the Court to develop a procedure so that appropriate representative counsel can be granted prompt access to those Petitioners, if any, who are being force fed in order to assess their condition and to attempt to persuade them to do nothing further to hasten their deterioration or demise.