# Exhibit 6

| National Journal | The Hotline | CongressDaily | Technology Daily | American Health Line | Home |

**National Journal Cover Stories**

Click here for a print friendly version

**National Journal Group**
Learn more about our publications and sign up for a free trial.

— ADVERTISEMENT —

— ADVERTISEMENT —

**E-Mail Alerts**
Get notified the moment your favorite features are updated.

**Need A Reprint?**
Click here for details on reprints, permissions and back issues.

**Advertise With Us**
Details on advertising with National Journal Group -- both online and in print -- can be found in our online media kit.

**Go Wireless**
Get daily political updates on your handheld computer.

GOVEXEC.COM

COVER STORY
# Empty Evidence

By Corine Hegland
© National Journal Group Inc.
Friday, Feb. 3, 2006

*"If you think of the people down there, these are people, all of whom were captured on a battlefield. They're terrorists, trainers, bomb makers, recruiters, financiers, [**Osama bin Laden**'s] bodyguards, would-be suicide bombers, probably the 20th 9/11 hijacker."*
-- Defense Secretary **Donald Rumsfeld**, June 27, 2005

Some of the men Rumsfeld described -- the terrorists, the trainers, the financiers, and the battlefield captures -- are indeed at Guantanamo. But *National Journal*'s detailed review of government files on 132 prisoners who have asked the courts for help, and a thorough reading of heavily censored transcripts from the Combatant Status Review Tribunals conducted in Guantanamo for 314 prisoners, didn't turn up very many of them. Most of the "enemy combatants" held at Guantanamo -- for four years now -- are simply not the worst of the worst of the terrorist world.

Many of them are not accused of hostilities against the United States or its allies. Most, when captured, were innocent of any terrorist activity, were Taliban foot soldiers at worst, and were often far less than that. And some, perhaps many, are guilty only of being foreigners in Afghanistan or Pakistan at the wrong time. And much of the evidence -- even the classified evidence -- gathered by the Defense Department against these men is flimsy, second-, third-, fourth- or 12th-hand. It's based largely on admissions by the detainees themselves or on coerced, or worse, interrogations of their fellow inmates, some of whom have been proved to be liars.

**Thomas Wilner**, a partner at the Washington law firm Shearman and Stearling who is representing six Kuwaitis at Guantanamo, summarized the evidence against them: "Bullshit hearsay.... The information in some cases

Also In This Issue
Guantanamo's Grip

Who Is at Guantanamo Bay

POLICY COUNCIL:
SPONSORED LINKS

Position papers, expert contacts and other resources from Policy Council members are available below.

is, at best, hearsay allegations [obtained] long after capture."

One thing about these detainees is very clear: Notwithstanding Rumsfeld's description, the majority of them were not caught by American soldiers on the battlefield. They came into American custody from third parties, mostly from Pakistan, some after targeted raids there, most after a dragnet for Arabs after 9/11.

Much of the evidence against the detainees is weak. One prisoner at Guantanamo, for example, has made accusations against more than 60 of his fellow inmates; that's more than 10 percent of Guantanamo's entire prison population. The veracity of this prisoner's accusations is in doubt after a Syrian prisoner, **Mohammed al-Tumani**, 19, who was arrested in Pakistan, flatly denied to his Combatant Status Review Tribunal that he'd attended the jihadist training camp that the tribunal record said he did.

Tumani's denial was bolstered by his American "personal representative," one of the U.S. military officers -- not lawyers -- who are tasked with helping prisoners navigate the tribunals. Tumani's enterprising representative looked at the classified evidence against the Syrian youth and found that just one man -- the aforementioned accuser -- had placed Tumani at the terrorist training camp. And he had placed Tumani there three months before the teenager had even entered Afghanistan. The curious U.S. officer pulled the classified file of the accuser, saw that he had accused 60 men, and, suddenly skeptical, pulled the files of every detainee the accuser had placed at the one training camp. None of the men had been in Afghanistan at the time the accuser said he saw them at the camp.

The tribunal declared Tumani an enemy combatant anyway.

### Guilt by Wristwatch

"It's the Salem witchcraft trials," said **Marc Falkoff** of Covington and Burling's New York City office, who represents 17 Yemenis, several of them fingered -- falsely, according to Falkoff -- by different accusers. "You get one guy to start making accusations, and whether it's believable or not doesn't matter." Front-line military interrogators might know that the accusations are false, but their superiors reading the files later do not.

The government has given Falkoff access to the complete files for 16 of his clients. Of those men, he says, "you bring them into any court of law right now, and a judge is going to release them. It doesn't matter what the standard of review is going to be -- I'm not even talking about guilt beyond a reasonable doubt."

At least eight prisoners at Guantanamo are there even though they are no longer designated as enemy combatants. One perplexed attorney, whose client does not want public attention, learned that the man was no longer considered an enemy combatant only by reading a footnote in a Justice Department motion asking a federal judge to put a slew of habeas corpus cases on hold. The attorney doesn't know why the man is still in Cuba.

"The people you've been going up against in court have been saying he's the worst of the worst, Osama's right-hand man," said **Anant Raut**, an attorney with the Washington firm of Weil, Gotshal, & Manges. "Then you go in there, and it's a guy who is as confused as you are as to why he is there." Raut has one client, a Saudi, who is classified as an enemy combatant largely because he spent a couple of weeks on a Taliban bean farm. The man says the Taliban imprisoned him there because they thought he was a Saudi government spy.

*National Journal* could review only the unclassified parts of detainee files, consisting of memos, a summary of the evidence, and a transcript of the Combatant Status Review Tribunal proceeding. But federal courts ordered the Defense Department to give the volunteer lawyers the classified evidence by which their clients were found to be enemy combatants. The lawyers cannot discuss specifics of that evidence, but they uniformly say that nothing additional is there, just details and sourcing relating to the unclassified evidence.

"There is no smoking gun," said **John Chandler**, a partner in the Atlanta office of Sutherland Asbill & Brennan. One of his Guantanamo clients, picked up in Pakistan, is designated an enemy combatant in part because he once traveled on a bus with wounded Taliban soldiers in Afghanistan. The prisoner denies it, saying it was only a public bus. But then there's the prisoner's Casio watch. According to the Defense Department files, his watch is similar to another Casio model that has a circuit board that Al Qaeda has used for making bombs. The United States is using the Qaeda-favored Casio wristwatch as evidence against at least nine other detainees. But the offending model is sold in sidewalk stands around the world and is worn by one *National Journal* reporter. The primary difference between Chandler's client's watch and the Casio in question is that the detainee's model hasn't been manufactured for years, according to the U.S. military officer who was his personal representative at the tribunal.

### Guilt by Association

**Baher Azmy** of Seton Hall Law School represents **Murat Kurnaz**, a Turk who is at Guantanamo. "The government has no case against him," Azmy says. Kurnaz was plucked off a bus in Pakistan and subsequently accused of being friends with a suicide bomber. The government did not tell Kurnaz's tribunal that his friend is alive and therefore could not be the referenced suicide bomber. In March, Kurnaz's file was accidentally, and briefly, declassified: According to the *Washington Post*, it consisted of memos from domestic and foreign intelligence sources stating that Kurnaz posed no threat. The file, however, contained one anonymous memo contradicting the rest and claiming he was connected to Al Qaeda. In January 2005, a federal judge singled out Kurnaz's case as evidence of the lack of due process in the Guantanamo tribunals. The judge said that his tribunal had ignored exculpatory evidence and relied instead on the single anonymous memo that was not credible.

**Julia Tarver Mason**, a partner with Paul, Weiss, a firm based in New York

City, represents a number of detainees, including a Saudi -- an amputee -- whom Afghanistan's Northern Alliance turned over to the Americans. The alliance had taken him from a hospital. She says that the classified evidence against the men she represents has "details, but no meat." The evidence might say, for example, that somebody said someone was a member of an aid group, and that aid group has been known to have some links to Al Qaeda, Mason says. "It's all 12 steps removed."

**George Brent Mickum**, a partner with Washington law firm Keller and Heckman, represents two British residents held at Guantanamo. "I can tell you what's not there," Mickum said of the classified evidence against his clients. "What's not there is any evidence that any of my clients was associated with Al Qaeda in any way." The men were arrested on a business trip to Gambia. According to press reports, British intelligence suspected at the time that the two men intended to establish a terrorist training facility there. But today, the accusation against both men is only that they were associated with Abu Qatada, a radical but popular London cleric who is now in prison in Britain.

Neither man denies the friendship with Qatada: One of the detainees, **Bisher al-Rawi**, says he served as a liaison between Qatada and British intelligence at the request of the MI-5 domestic intelligence agency. The tribunal for the other man, **Jamil el-Banna**, met four times before deciding that he was an enemy combatant. Even so, el-Banna's personal representative, who had access to the classified files, objected. The British government was well aware of el-Banna's actions on British soil, the officer wrote, and the record is "insufficient to show [the detainee] should be classified as an enemy combatant for his actions in Gambia."

### To Protect the Soldiers

If many of the men held at Guantanamo were not caught in battle, and have not been tied directly to hostilities against the United States, why are they there?

"I think the standards for sending someone to Guantanamo in 2002 and early 2003 were not as high as they should have been," said **Mark Jacobson**, who was an assistant for detainee policy in Rumsfeld's office from November 2002 through August 2003. When *National Journal*

> The lawyers representing Guantanamo prisoners say the evidence against their clients is weak, indirect, and often based on lies from other detainees. Defense Department documents suggest they are right.

———————  ADVERTISEMENT  ———————

described some of the men in this story to Jacobson, he said he suspected that there was more information that was not referenced in the classified or the declassified files. But if the files were accurate, he said, "then it's reasonable and likely" that those men were in the batches taken to Guantanamo early on in 2002.

——————— ADVERTISEMENT ———————

The filtering process for deciding who was sent to Guantanamo wasn't perfect, Jacobson said, nor should it have been. To protect U.S. soldiers still fighting in Afghanistan it was better to err on the side of caution and to send more, rather than fewer, men to Guantanamo. "If it's the other way around, then you're doing it wrong."

But nuance didn't exactly survive the air convoys to Cuba. The men in the orange jumpsuits, **President Bush** said, were terrorists. They were the most dangerous, best-trained, vicious killers on the face of the earth, Rumsfeld said. They were so vicious, if given the chance they would gnaw through the hydraulic lines of a C-17 while they were being flown to Cuba, said Air Force Gen. **Richard Myers**, chairman of the Joint Chiefs of Staff.

But the CIA didn't see it that way. By the fall of 2002, it was common knowledge around CIA circles that fewer than 10 percent of Guantanamo's prisoners were high-value terrorist operatives, according to **Michael Scheuer** who headed the agency's bin Laden unit through 1999 and resigned in 2004. Most of the men were probably foot soldiers at best, he said, who were "going to know absolutely nothing about terrorism." Guantanamo prisoners might be pumped for information about how they learned to fight, which could help American soldiers facing trained Islamic insurgencies. But the Defense Department and FBI interrogators at Guantanamo were interested more in catastrophic terrorism than in combat practicalities. They kept asking "every one of these guys about 9/11 and when was the next attack," questions most of these low-level prisoners couldn't answer, Scheuer said.

Even as the CIA was deciding that most of the prisoners at Guantanamo didn't have much to say, Pentagon officials were getting frustrated with how little the detainees were saying. So they ramped up the pressure and gave interrogators more license.

The questions to the detainees about 9/11 and Al Qaeda and about each other were so constant, so repetitive, so oppressive that some prisoners, out of exasperation or fatigue or fear, just gave in and said, sure, I'm a terrorist. False confessions and false accusations are rampant, according to the lawyers and the Defense Department records.

One man slammed his hands on the table during an especially long interrogation and yelled, "Fine, you got me; I'm a terrorist." The interrogators knew it was a sarcastic statement. But the government, sometime later, used it as evidence against him: "Detainee admitted he is a terrorist" reads his tribunal evidence. The interrogators were so outraged that they sought out the detainee's personal representative to explain it to him that the statement was not a confession.

A Yemeni, whom somebody fingered as a bin Laden bodyguard, finally said in exasperation during one long interrogation, "OK, I saw bin Laden five times: Three times on Al Jazeera and twice on Yemeni news." And now his "admission" appears in his enemy combatant's file: "Detainee admitted to knowing Osama bin Laden."

By June 2004 conditions were so bad at Guantanamo that the International Committee of the Red Cross, the only civilian group allowed to meet with detainees, sent a furious confidential report to the White House charging that the entire system in Cuba was "devised to break the will of prisoners at Guantanamo," making them "wholly dependent on their interrogators" through "humiliating acts, solitary confinement, temperature extremes, use of forced positions," according to a Defense report leaked to the *New York Times*. The report called the operations "tantamount to torture."

Pentagon officials, meanwhile, were citing the "safe, humane, and professional detention operation at Guantanamo that is providing valuable information in the war on terrorism."

### Wrong Questions, Wrong People

The one question nobody seemed to ask at Guantanamo was whether they were asking the right questions of the right people in the first place. After all, despite the rhetoric, most of the men at Guantanamo, or at least the 132 with court records and the 314 with redacted transcripts, came into American custody by way of third parties who had their own motivations for turning people in, including paybacks and payoffs.

In Afghanistan, from late 2001 through the early months of 2003, local and tribal informers played on America's naivete by reporting their enemies as Qaeda members, according to a former intelligence operative there. The Americans, upon investigating, would find that a man did have weapons and assume that he was, indeed, Al Qaeda. "They wouldn't know the factions," the operative said, "and they wouldn't think, 'This is Afghanistan. Of course he has weapons.'"

Ignorance of local politics might explain how, for example, an Arabic-

speaking Iraqi Shiite ended up at Guantanamo accused of serving as the regional intelligence director for the Pashto-speaking Sunni Taliban.

Some of the men at Guantanamo came from targeted, U.S.-guided raids in Pakistani cities, and the cases against those men tend to be fairly strong. But the largest single group at Guantanamo Bay today consists of men caught in indiscriminate sweeps for Arabs in Pakistan. Once arrested, these men passed through several captors before being given to the U.S. military. Some of the men say they were arrested after asking for help getting to their embassies; a few say the Pakistanis asked them for bribes to avoid being turned over to America.

Others assert that they were sold for bounties, a charge substantiated in 2004 when Sami Yousafzai, a *Newsweek* reporter then stringing for ABC's "20/20," visited the Pakistani village where five Kuwaiti detainees were captured. The locals remembered the men. They had arrived with a larger group of a hundred refugees a few weeks after Qaeda fighters had passed through. The villagers said they had offered the group shelter and food, but somebody in the village sold out the guests. Pretty soon, bright lights came swooping down from the skies. "Helicopters ... were announcing through loud speakers: 'Where is Arab? Where is Arab?' And, 'Please, you get $1,000 for one Arab,' " one resident told Yousafzai.

"The one thing we were never clear of was where they came from," Scheuer said of the Guantanamo detainees. "DOD picked them up somewhere." When *National Journal* told Scheuer that the largest group came from Pakistani custody, he chuckled. "Then they were probably people the Pakistanis thought were dangerous to Pakistan," he said. "We absolutely got the wrong people."

The sweeps in Pakistan did pick up a few Qaeda members, but most of them were low level. People familiar with Pakistani politics agree that in the chaos of the war, simple foot soldiers or innocent bystanders were more likely to wind up in American custody than were senior operatives. "It was helter-skelter, and it was perfectly possible innocents were arrested, while a lot of guilty guys knew how to evade [capture] and had the means to do so," said **Husain Haqqani**, an adviser to three former Pakistani prime ministers who now teaches international relations at Boston University.

Tribes in the border region and operatives in Pakistan's intelligence service were historically sympathetic to Al Qaeda and the Taliban. Almost certainly, they aided senior Qaeda and Taliban members fleeing Afghanistan. At the same time, Islamabad was eager to strengthen its new alliance with Washington. The Americans wanted prisoners, and nobody was looking too closely at who those prisoners were.

Add a healthy dollop of cash spread around by both hunters and prey, and a U.S. military bureaucracy dedicated to protecting Americans against a threat from an unfamiliar corner of the world, and you have an unsettling formula for determining who got caught and who got away. It was "win-win,"

Haqqani said. "The Americans get their prisoners, Pakistanis get their praise, the guy who captures the prisoners gets his reward, and Al Qaeda gets its escape."

### POLICY COUNCIL: SPONSORED LINKS

The organizations below are paying members of National Journal's Policy Council. These links, which are included based on relevance to this article, do not involve the National Journal Group editorial staff.

**American Civil Liberties Union**
- Oppose the Proposed Changes to the McCain Anti-Torture Amendment and the Graham Court-Stripping Amendment
- Letter to Representative Markey Urging Passage of the Torture Outsourcing Prevention Act

**National Association of Counties**
- Loss of Federal Entitlement Benefits

**Senate Republican Policy Committee**
- Guantanamo Bay Detentions Comply with Domestic and International Law

——— ADVERTISEMENT ———

——— ADVERTISEMENT ———

**Need A Reprint Of This Article?**
National Journal Group offers both print and electronic reprint services, as well as permissions for academic use, photocopying and republication. Click here to order, or call us at 877-394-7350.

[ E-mail NationalJournal.com ]
[ Site Index | Staff | Privacy Policy | E-Mail Alerts ]
[ Reprints And Back Issues | Content Licensing ]
[ Make NationalJournal.com Your Homepage ]

[ About National Journal Group Inc. ]
[ Employment Opportunities ]

Copyright 2006 by National Journal Group Inc.
The Watergate · 600 New Hampshire Ave., NW
Washington, DC 20037
202-739-8400 · fax 202-833-8069
NationalJournal.com is an Atlantic Media publication.