# Exhibit 7

# REPORT ON GUANTANAMO DETAINEES

## A Profile of 517 Detainees through Analysis of Department of Defense Data

By
Mark Denbeaux
Professor, Seton Hall University School of Law and
Counsel to two Guantanamo detainees

Joshua Denbeaux, Esq.
Denbeaux & Denbeaux

David Gratz, John Gregorek, Matthew Darby, Shana Edwards,
Shane Hartman, Daniel Mann and Helen Skinner
Students, Seton Hall University School of Law

# THE GUANTANAMO DETAINEES: THE GOVERNMENT'S STORY
Professor Mark Denbeaux* and Joshua Denbeaux*

*An interim report*

## EXECUTIVE SUMMARY

The media and public fascination with who is detained at Guantanamo and why has been fueled in large measure by the refusal of the Government, on the grounds of national security, to provide much information about the individuals and the charges against them. The information available to date has been anecdotal and erratic, drawn largely from interviews with the few detainees who have been released or from statements or court filings by their attorneys in the pending *habeas corpus* proceedings that the Government has not declared "classified."

This Report is the first effort to provide a more detailed picture of who the Guantanamo detainees are, how they ended up there, and the purported bases for their enemy combatant designation. The data in this Report is based entirely upon the United States Government's own documents.[1] This Report provides a window into the Government's success detaining only those that the President has called "the worst of the worst."

Among the data revealed by this Report:

1. Fifty-five percent (55%) of the detainees are not determined to have committed any hostile acts against the United States or its coalition allies.

2. Only 8% of the detainees were characterized as al Qaeda fighters. Of the remaining detainees, 40% have no definitive connection with al Qaeda at all and 18% are have no definitive affiliation with either al Qaeda or the Taliban.

3. The Government has detained numerous persons based on mere affiliations with a large number of groups that in fact, are not on the Department of Homeland Security terrorist watchlist. Moreover, the nexus between such a detainee and such organizations varies considerably. Eight percent are detained because they are deemed "fighters for;" 30% considered "members of;" a large majority – 60% -- are detained merely because they are "associated with" a group or groups the Government asserts are terrorist organizations. For 2% of the prisoners their nexus to any terrorist group is unidentified.

4. Only 5% of the detainees were captured by United States forces. 86% of the detainees were arrested by either Pakistan or the Northern Alliance and turned over to United States custody.

---

\* The authors are counsel for two detainees in Guantanamo.
[1] See, Combatant Status Review Board Letters, Release date January 2005, February 2005, March 2005, April 2005 and the Final Release available at the Seton Hall Law School library, Newark, NJ.

This 86% of the detainees captured by Pakistan or the Northern Alliance were handed over to the United States at a time in which the United States offered large bounties for capture of suspected enemies.

      5.      Finally, the population of persons deemed not to be enemy combatants – mostly Uighers – are in fact accused of more serious allegations than a great many persons still deemed to be enemy combatants.

# INTRODUCTION

The United States Government detains over 500 individuals at Guantanamo Bay as so-called "enemy combatants." In attempting to defend the necessity of the Guantanamo detention camp, the Government has routinely referred this group as "the worst of the worst" of the Government's enemies.[2] The Government has detained most these individuals for more than four years; only approximately 10 have been charged with any crime related to violations of the laws of war. The rest remain detained based on the Government's own conclusions, without prospect of a trial or judicial hearing. During these lengthy detentions, the Government has had sufficient time for the Government to conclude whether, in fact, these men were enemy combatants and to document its rationale.

On March 28, 2002, in a Department of Defense briefing, Secretary of Defense Donald Rumsfeld said:

> As has been the case in previous wars, the country that takes prisoners generally decides that they would prefer them not to go back to the battlefield. They detain those enemy combatants for the duration of the conflict. They do so for the very simple reason, which I would have thought is obvious, namely to keep them from going right back and, in this case, killing more Americans and conducting more terrorist acts.[3]

The Report concludes, however, that the large majority of detainees never participated in any combat against the United States on a battlefield. Therefore, while setting aside the significant legal and constitutional issues at stake in the Guantanamo litigation presently being considered in the federal courts, this Report merely addresses the factual basis underlying the public representations regarding the status of the Guantanamo detainees.

Part I of this Report describes the sources and limitations of the data analyzed here. Part II describes the "findings" the Government has made. The "findings" in this sense, constitutes the Government's determination that the individual in question is an enemy combatant, which is in turn based on the Government's classifications of terrorist groups, the asserted connection of the individual with the purported terrorist groups, as well as the commission of "hostile acts," if any, that the Government has determined an individual has committed. Part III then examines the evidence, including sources for such evidence, upon which the Government has relied in making these findings. Part IV addresses the continued detention of individuals deemed *not* to be enemy

---

[2] The Washington Post, in an article dated October 23, 2002 quoted Secretary Rumsfeld as terming the detainees "the worst of the worst." In an article dated December 22, 2002, the Post quoted Rear Adm. John D. Stufflebeem, Deputy Director of Operations for the Joint Chiefs of Staff, "They are bad guys. They are the worst of the worst, and if let out on the street, they will go back to the proclivity of trying to kill Americans and others." Donald Rumsfeld Holds Defense Department Briefing. (2002, March 28). FDCH Political Transcripts. Retrieved January 10, 2006 from Lexis-Nexis database.

[3] Threats and Responses: The Detainees; Some Guantanamo Prisoners Will Be Freed, Rumsfeld Says, (2002, October 23). The New York Times, p 14. Retrieved February 7, 2006 from Lexis-Nexis database.

4

combatants, comparing the Government's allegations against such persons to similar or more serious allegations against persons still deemed to be "enemy combatants."

## I.  THE DATA

The data in this Report are based on written determinations the Government has produced for detainees it has designated as enemy combatants.[4] These written determinations were prepared following military hearings commenced in 2004, called Combatant Status Review Tribunals, designed to ascertain whether a detainee should continue to be classified as an "enemy combatant." The data are obviously limited.[5] The data are framed in the Government's terms and therefore are no more precise than the Government's categories permit. Finally, the charges are anonymous in the sense that the summaries upon which this interim report relies are not identified by name or ISN for any of the prisoners. It is therefore not possible at this time to determine which summary applies to which prisoner.

Within these limitations, however, the data are very powerful because they set forth the best case for the status of the individuals the Government has processed. The data reviewed are the documents prepared by the Government containing the evidence upon which the Government relied in making its decision that these detainees were enemy combatants. The Report assumes that the information contained in the CSRT Summaries of Evidence is an accurate description of the evidence relied upon by the Government to conclude that each prisoner is an enemy combatant.

Such summaries were filed by the Government against each individual detainee's in advance of the Combatant Status Review Tribunal (CRST) hearing.

---

[4] The files reviewed are available at the Seton Hall Law School library, Newark, NJ.

[5] There is other data currently being compiled based on different information. Each prisoner at Guantanamo who has had summaries of evidence filed against them has had an internal administrative evaluation of the charges. The process is that a Combatant Status Review Tribunal, or CSRT, has received the charges and considered them. Some of those enemy detainees who are represented by counsel in pending habeas corpus Federal District Courts have received (when so ordered by the Federal District Court Judge) the classified and declassified portion of the CSRT proceedings. The CSRT proceedings are described as CSRT returns. The declassified portion of those CSRT returns are being reviewed and placed into a companion data base.

5

## II. THE GOVERNMENT'S FINDINGS OF ENEMY COMBATANT STATUS

### A. Structure of the Government's Findings

As to each detainee, the Government provides what it denominates as a "summary of evidence." Each summary contains the following sentence:

> The United States Government has *previously determined* that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is....

[Emphasis supplied]

Since the Government had "previously determined" that each detainee at Guantanamo Bay was an enemy combatant before the CSRT hearing, the "summary of evidence" released by the Government is not the Government's *allegations* against each detainee but a summary of the Government's *proofs* upon which the Government found that each detainee, is in fact, an enemy combatant.

Each summary of evidence has four numbered paragraphs. The first[6] and fourth[7] are jurisdictional. The second[8] paragraph states the Government's definition of "enemy combatant" for the purpose of the CSRT proceedings.

The third paragraph summarizes the evidence that satisfied the Government that each detainee is an enemy combatant. Paragraph 3(a) is the Government's determination of the detainee relationship with a "defined terrorist organization."[9] Paragraph 3(b) is the place in which Government's finds that a detainee has or has not committed "hostile acts" against U.S. or coalition forces.

Forty five percent of the time the Government concluded that the detainee committed 3(b) hostile acts against United States or coalition forces. In those cases, there is a paragraph 3(b) ("¶3(b)") in the CSRT summary so stating. Fifty five percent of the time, the Government

---

[6] Paragraph 1: "Under the provisions of the Department of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant."

[7] Paragraph 4: "The detainee has the opportunity to contest his determination as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses."

[8] Paragraph 2: "(A)n Enemy Combatant has been defined as: [A]n individual who was part of *or* supporting the Taliban *or* al Qaeda forces, *or* associated forces that are engaged in hostilities against the United States *or* its coalition partners. This includes any person who committed a belligerent act *or* has directly supported hostilities in aid of enemy forces." [Emphasis supplied]

[9] Many of the "defined terrorist organizations" referenced in the CSRT summaries of evidence are not considered terrorist organizations by the Department of Homeland Security. See *Infra*.

6

concluded that the detainee did not commit such an act and omitted the entire ¶3(b) section from the CSRT summary. For these detainees whose CSRT summaries include a finding under ¶3(b), the Government listed its specific findings 'proving' hostile acts in a brief series of sub-paragraphs. Of those CSRT summaries that contain a ¶3(b) "hostile acts" determination, the mean number of sub-paragraphs is two; that is, for the 55% of detainees the Government has found committed ¶3(b) "hostile acts" the Government lists, on average two pieces of evidence. Fewer than 2% of all 517 CSRT summaries contained more than five ¶3(b) sub-paragraphs; while the vast majority contained 1, 2 or 3 such 'proofs' of hostile acts.

### B.    The Definition of an 'Enemy Combatant'

For the purposes of the Combatant Status Review Tribunal, an "enemy combatant" has been defined as:

> [A]n individual who was part of *or* supporting the Taliban *or* al Qaeda forces, *or* associated forces that are engaged in hostilities against the United States *or* its coalition partners. This includes any person who committed a belligerent act *or* has directly supported hostilities in aid of enemy forces.[10]

This could be interpreted alternatively as requiring either a combatant be *both* a member of prohibited group *and* engaged in hostilities against the U.S. or coalition forces *or* only that a combatant be anyone *either* a member of prohibited group *or* engaged in hostilities to U.S. or coalition forces. Indeed, under this definition, one could be detained for an undefined level of "support of" groups considered hostile to the United States or its coalition partners.

### C.    Categories of Evidence Supporting Enemy Combatant Designation

---

[10] The definition of "enemy combatants" for the purpose of the Guantanamo detainment has evolved over time. In January 2002, when the first detainees were sent from Pakistan and Afghanistan to Cuba they were termed, as were the detainees in *Ex Parte Quirin, (47 F.Supp. 431)* "unlawful belligerents." In *Hamdi v. Rumsfeld*, (542 U.S. 507) the Government defined "enemy combatant" far more narrowly as someone who was "'part of or supporting forces hostile to the United States or coalition partners' in Afghanistan *and* who 'engaged in an armed conflict against the United States' there." Later, in response to *Rasul v. Bush (542 U.S. 466)*, the detainees were called "enemy combatants." (Emphasis supplied)

In February 2004, Secretary Rumsfeld, said, "The circumstances in which individuals are apprehended on the battlefield can be ambiguous, as I'm sure people here can understand. This ambiguity is not only the result of the inevitable disorder of the battlefield; it is an ambiguity created by enemies who violate the laws of war by fighting in civilian clothes, by carrying multiple identification documentations, by having three, six, eight, in one case 13 different ...aliases.... Because of this ambiguity, even after enemy combatants are detained, it takes time to check stories, to resolve inconsistencies or, in some cases, even to get the detainee to provide any useful information to help resolve the circumstance."

In an August 13, 2004 News Briefing, Gordon England, Secretary of the Navy and Secretary Rumsfeld's designee for the tribunal process at Guantanamo stated that, "The definition of an enemy combatant is in the implementing orders, which have been passed out to everyone. But, in short, it means anyone who is part of supporting the Taliban or al Qaeda forces or associated forces engaging in hostilities against the United States or our coalition partners."

7

The Government divides the evidence against detainees into two sections: a ¶3(a) nexus with prohibited organizations and a ¶3(b) participation in military operations or commission of hostile acts. Paragraph 3 always begins with the allegations that each detainee met all the requirements contained in the definition of paragraph two. More often than not the Government finds that the detainees did not commit the hostile or belligerent acts.

1. **¶3(a): Enemy Combatant because of Nexus with Prohibited Organization**

   a. *Definition of Prohibited Organizations*

The data reveals that the Government divides a detainee's enemy combatant status into six distinct categories that describe the terrorist organization with whom the detainee is affiliated. Figure 1 illustrates the breakdown of each group's representation by the data:

1. al Qaeda (32%)
2. al Qaeda & Taliban (28%)
3. Taliban (22%)
4. al Qaeda OR Taliban (7%)
5. Unidentified Affiliation (10%)
6. Other (1%)



Fig. 1  3a Group Affiliations

The CSRT Summary of Evidence provides no way to determine the difference between "unidentified/none alleged" and "other" and no explanation for why there are separate categories for both "al Qaeda *and* Taliban" and "al Qaeda *or* Taliban."

If, after four years of detention, the Government is unable to determine if a detainee is either al Qaeda or Taliban, then it is reasonable to conclude that the detainee is neither. Under this assumption, the data reveals that 40% of the detainees are not affiliated with al Qaeda and 18% percent of the detainees are not affiliated with either al Qaeda or the Taliban.

8

b.    *Nexus with the Identified Organization*

The Government also describes each prisoner's nexus to the respective organization: "fighter for;" "member of;" and "associated with."

The data explain that there are three main degrees of connection between the detainee and the organization with which he is connected.[11] Detainees are either:

1.    "Fighters for"
2.    "Members of"
3.    "Associated with"



Figure 2 illustrates that of the nexus type for all the prisoners, regardless of the group to which they are "connected," by far the greatest number of prisoners are identified only as being "associated with" one group or another. A much smaller percentage – 30% – is identified as "members of." Only 8% are classified as "fighters for."

The definition of "fighters for" would seem to be obvious, while definitions of "members of" and "associated with" are less clear and could justify a very broad level of attenuation. According to the Government's expert on al Qaeda membership, Evan Kohlman, simply being told that one had been selected as a member would qualify one as a member:

> Al-Qaeda leaders could dispatch one of their own — someone who is not top tier…to recruit someone and to tell them, I have been given a mandate to do this on behalf of senior al-Qaeda leaders… even though perhaps this individual has never sworn an official oath and this person has never been to an al-Quaeda training camp, nor have they actually met, say, Osama bin Ladin.[12]

This expansive definition of membership in al Qaeda could thus be applied to anyone who the Government believed ever spoke to an al Qaeda member. Even under this broad framework, the Government concluded that a full 60% of the detainees do not have even that minimum level of contact with an al Qaeda member.

---

[11] While more than 95% of the summaries of the evidence used one of these three categories, approximately 4% used other nexus descriptions. Most notably, 2% used a "supported" descriptor which was re-categorized as "associated with." See Appendix C for a full account of re-categorizations of data.

[12] *US vs. Pachir*, Dkt. No., T113.

9

Membership in the Taliban is different and also not clearly defined. According to the Government, one can be a conscripted (and therefore presumably unwilling) member of the Taliban and still be an enemy combatant.

Figures 3 and 4 compare the nexus between enemy combatants with Al Qaeda and the Taliban. In contrast to the "al Qaeda only" category, the "Taliban only" category shows that a significantly higher percentage of the prisoners are designated "members of" and "fighters for" with a reduced number being "associated with."

 

Seventy eight percent of those prisoners who are identified as being both "al Qaeda and Taliban" are merely "associated with;" 19% are "members of;" and 3% are "fighters for." (Fig. 5) When the Government cannot specifically identify a detainee as a member of one or the other, al Qaeda or the Taliban, the degree of connection attributed to such detainees appears tenuous. (Fig. 6)

 


The Government's summary of evidence

10

recognizes that more often than not members of the Taliban are not members of al Qaeda. The Government categorizes as stand alone al Qaeda or stand alone Taliban more than 54% of the detainees, and only 28% of the detainees as members of both.

The data provides no explanation for the explicit distinction between those persons identified as being connected to "al Qaeda *and* the Taliban" as opposed to "al Qaeda *or* the Taliban". [Emphasis supplied]

2. ¶ 3(b): The Government's Findings on Detainees' 3(b) Hostile Acts against the United States or Coalition Forces

Although the Government's public position is that these detainees are "the worst of the worst," see *supra* note 2, the data demonstrates that the Government has already concluded that a majority of those who continue to be detained at Guantanamo have no history of any 3(b) hostile act against the United States or its allies.

According to the Government, fewer than half of the detainees engaged in 3(b) hostile acts against the United States or any members of its coalition. As figure 7 depicts, the Government has concluded that no more than 45% of the detainees have committed some 3(b) hostile act.



Fig. 7

11

This is true even though the Government's definition of a 3(b) hostile act is not demanding. As an example, the following was the evidence that the Government determined was sufficient to constitute a 3(b) hostile act:

> The detainee participated in military operations against the United States and its coalition partners.
> 1. The detainee *fled*, along with others, when the United States forces bombed their camp.
> 2. The detainee was captured in Pakistan, along with other Uigher fighters.[13]



Fig. 8

Cross-analyzing the ¶3(a) and ¶3(b) data, individuals in some groups are less likely to have committed hostile acts than those in others. In the group "al Qaeda *or* Taliban," for example, 71% of the detainees have <u>not</u> been found to have committed any hostile act. (See Fig. 8)

Of the "other" detainees in Figure 9, that is, the 18% whose 3(a) is either "Unidentified", "None alleged", "al Qaeda OR Taliban" or "other," only 24% have been determined to have committed a 3(b) hostile act. (See Fig 10)





---

[13] See CSRT Summary of Evidence available at the Seton Hall Law School library, Newark, NJ [Emphasis supplied].

12

Thus, the less clear the Government's characterization of a detainee's affiliation with a prohibited group is, the less likely the detainee is to have committed a hostile act. This is notable because the percentage of detainees with whom the Government cannot clearly connect with a prohibited group is so large.[14]

The same pattern holds true when the degree of connection between the detainee and the affiliated group lessens. Thirty-two percent of the detainees are stand alone al Qaeda. Fifty seven percent of those detainees have a nexus to al Qaeda described as "associated with." Of those 57% whom are merely associated with al Qaeda, 72% of them have not committed 3(b) hostile acts. (See Fig. 3 and 11) Thus, the data illustrates that not only are the majority of the al Qaeda detainees merely "associated with" al Qaeda, but the Government concludes that a substantial percentage of those detainees did not commit 3(b) hostile acts.



Fig. 11

---

[14] See Fig 1: "3(a) Group Affiliations" supra, p. 7: the sum of "al Qaeda OR Taliban" (7%); Unidentified/"None alleged" (10%); and "Other" (1%) equals 18%. This is the 18% that is represented as "Others" in Fig. 9.

13

### III. THE GOVERNMENT'S EVIDENCE THAT THE DETAINEES ARE ENEMY COMBATANTS

The data permit at least some answers to two questions: How was the evidence of their enemy combatant status obtained? What evidence does the Government have as to the detainees commission of 3(b) violations?

#### A. Sources of Detainees and Reliability of the Information about Them

Figure 12 explains who captured the detainees. Pakistan was the source of at least 36% of all detainees, and the Afghanistan Northern Alliance was the source of at least 11% more. The pervasiveness of Pakistani involvement is made clear in Figure 13 which shows that of the 56% whose captor is identified, 66% of those detainees were captured by Pakistani Authorities or in Pakistan. Thus, if 66% of the unknown 44% were derived from Pakistan, the total captured in Pakistan or by Pakistani Authorities is fully 66%.




Since the Government presumably knows which detainees were captured by United States forces, it is safe to assume that those whose providence is not known were captured by some third party. The conclusion to be drawn from the Government's evidence is that 93% of the detainees were not apprehended by the United States.[15] (See Fig. 12) Hopefully, in assessing the enemy combatant status of such detainees, the Government appropriately addressed the reliability of information provided by those turning over detainees although the data provides no assurances that any proper safeguards against mistaken identification existed or were followed.

---

[15] Presuming a fixed 7% of detainees were captured by US or coalition forces, the remaining detainees whose captor is unknown can be extrapolated to 68% "Pakistani Authorities or in Pakistan", 21% "Northern Alliance/Afghan Authorities", and 4% "other."

14

The United States promised (and apparently paid) large sums of money for the capture of persons identified as enemy combatants in Afghanistan and Pakistan. One representative flyer, distributed in Afghanistan, states:

> Get wealth and power beyond your dreams....You can receive millions of dollars helping the anti-Taliban forces catch al-Qaida and Taliban murders. This is enough money to take care of your family, your village, your tribe for the rest of your life. Pay for livestock and doctors and school books and housing for all your people.[16]

Bounty hunters or reward-seekers handed people over to American or Northern Alliance soldiers in the field, often soon after disappearing;[17] as a result, there was little opportunity on the field to verify the story of an individual who presented the detainee in response to the bounty award. Where that story constitutes the sole basis for an individual's detention in Guantanamo, there would be little ability either for the Government to corroborate or a detainee to refute such an allegation.

As shall be seen in consideration of the Uighers, the Government has found detainees to be enemy combatants based upon the information provided by the bounty hunters. As to the Uighers, at least, there is no doubt that bounties were paid for the capture and detainment of individuals who were not enemy combatants.[18] The Uigher have yet to be released.

The evidence satisfactory to the Government for some of the detainees is formidable. For this group, the Government's evidence portrays a detainee as a powerful, dangerous and knowledgeable man who enjoyed positions of considerable power within the prohibited organizations. The evidence against them is concrete and plausible. The evidence provided for most of the detainees, however, is far less impressive.

The summaries of evidence against a small number of detainees indicate that some of the prisoners played important roles in al Qaeda. This evidence, on its face, seems reliable. For instance, the Government found that 11% of the detainees met with Bin Laden. Other examples include:

> ➢ A detainee who is alleged to have driven a rocket launcher to combat against the Northern Alliance.
> ➢ A detainee who held a high ranking position in the Taliban and who tortured,

---

[16] *See Infra.*, Appendix A.

[17] *See, e.g.* Mahler, Jonathan, The Bush Administration versus Salim Hamdan (2006, Jan. 8), *New York Times*, p. 44.

[18] White, Josh and Robin Wright. Detainee Cleared for Release Is in Limbo at Guantanamo. (2005, December 15), *Washington Post*, p. A09.

15