IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDULLAH AL TAYABI,           )
                              )
                              )
          Petitioner,         )
                              )
     v.                       )     Civil Action No. 05-2029 (JDB)
                              )
GEORGE W. BUSH, *et al.,*     )
                              )
          Respondents.        )
_____)

### DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.    I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.    I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Abdullah al Tayabi that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 15 February 2006              _____
                                     Teresa A. McPalmer
                                     CDR, JAGC, U. S. Navy



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 0326

**0 6 DEC** ᴿᴱᴄᴰ

From:  Director, Combatant Status Review Tribunal

Subj:  **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 332**

Ref:    (a) Deputy Secretary of Defense Order of 7 July 2004
        (b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #332 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

27 Nov 04

MEMORANDUM

From:  Legal Advisor
To:    Director, Combatant Status Review Tribunal

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 332

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #12 of 29 September 2004
       (2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review Tribunal
in accordance with references (a) and (b). After reviewing the record of the Tribunal, I find that:

   a. The detainee was properly notified of the Tribunal process and made a sworn statement at
   the Tribunal.

   b. The Tribunal was properly convened and constituted by enclosure (1). Note that some
   information in exhibit R-4 was redacted. The FBI properly certified in exhibit R-2 that the
   redacted information would not support a determination that the detainee is not an enemy
   combatant.

   c. The Tribunal complied with all provisions of references (a) and (b).

   d. The detainee requested no witness nor did he request any classified or unclassified
   documents be produced.

   e. The Tribunal's decision that detainee # 332 is properly classified as an enemy combatant
   was unanimous.

   f. The detainee's Personal Representative was given the opportunity to review the record of
   proceedings and declined to submit comments to the Tribunal.

2. The proceedings and decision of the Tribunal are legally sufficient and no corrective action is
required.

3. I recommend that the decision of the Tribunal be approved and the case be considered final.


JAMES R. CRISFIELD JR.
CDR, JAGC, USN

UNCLASSIFIED



# Department of Defense
## Director, Combatant Status Review Tribunals

29 Sep 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref:    (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

       MEMBERS:

███████████████ Colonel, U.S. Marine Corps Reserve; President

███████████████ Lieutenant Colonel, JAGC, U.S. Army;
       Member (JAG)

███████████ Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

26 October 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander

SUBJECT:  CSRT Record of Proceedings ICO ISN# 332

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ▮▮▮▮▮

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

## (U) **Combatant Status Review Tribunal Decision Report Cover Sheet**

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:  __#12__

(U) ISN#:  ___332___

Ref:　(a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
　　　(b) (U) CSRT Implementation Directive of 29 July 2004 (U)
　　　(c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:　(1) (U) Unclassified Summary of Basis For Tribunal Decision (U/FOUO)
　　　(2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
　　　(3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
　　　(4) (U) Copies of Documentary Evidence Presented (S/NF)
　　　(5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 14 October 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 14 October 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #332 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a part of, or supporting, Al-Qaeda, or other forces engaged in hostilities against the United States and its coalition partners as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12_____
ISN #: _____332_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant and is part of, or supporting, Al Qaida, or other forces engaged in hostilities against the United States or its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee was associated with forces engaged in hostilities with the United States or its coalition partners. The Detainee traveled to Afghanistan in August 2001 and received weapons training at the Al-Farouq training camp. The Detainee attempted to gain more training at another camp near Jalalabad, Afghanistan and then eventually was captured near the Pakistan border. The Detainee chose to participate in the Tribunal process. He called no witnesses and requested no documents be produced. The Detainee made a sworn verbal statement. The Detainee, in his verbal statement, denied that he was associated with forces engaged in hostilities with the United States or its coalition partners and was forced to tell this story that he had been so associated. He admitted traveling to Afghanistan with a friend but it was during school break. The Detainee denied receiving weapons training and stated that he and his friend only observed another individual disassemble and reassemble a Kalashnikov rifle. The Detainee stated that after his capture Afghan and American soldiers tortured him.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-13.

    b. Testimony of the following persons: Sworn statement of the Detainee.

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

**4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses**

The Detainee requested no witnesses and requested no additional evidence be produced; therefore, no rulings on these maters were required.

**5. Discussion of Unclassified Evidence**

The Tribunal considered the following unclassified evidence in making its determinations:

a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony. A summarized transcript of the Detainee's sworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee testified that he was not associated with forces engaged in hostilities with the United States or its coalition partners. He claimed that he is not associated with al Qaida, and if he were an enemy combatant, he would not have bought a round trip airline ticket to return home because he would have continued to fight. The only reason for his original statements is because when he was captured, interrogators in Kandahar, Kabul and Bagram, Afghanistan tortured him. The Detainee stated that he did not carry any weapons and did not participate in any fighting against the coalition. Because of the torture he received when he was originally captured, he claimed he had to admit to things that he did not do to stop the torture.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

c. The Detainee is properly classified as an enemy combatant and is part of, or supporting, Al-Qaida, or other forces engaged in hostilities against the United States or its coalition partners.

d. The Detainee stated that after he was captured, interrogators in Kandahar, Kabul and Bagram, Afghanistan tortured him. Because of the torture he claimed he received when he was originally captured, he claimed he had to admit to things that he did not do. The Detainee's allegations were not limited to occurrences within Afghanistan. The CITF liaison to OARDEC, OARDEC Chief of Staff, and the OARDEC legal advisor have been notified of the allegation outlined above, as documented in Exhibit R-3.

**8. Dissenting Tribunal Member's report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

## Summarized Sworn Detainee Statement

*When asked by the Tribunal President if the detainee understood the CSRT process, the Detainee answered, "Yes."*

*When asked by the Tribunal President if the detainee had any questions concerning the Tribunal process, the Detainee answered, "No."*

*When the Tribunal President stated he was referencing the Detainee Election form the detainee asked:*

Detainee: What does the Detainee Election form mean?

Tribunal President: This is the comment sheet that the Personal Representative has filled out and it identifies that you wish to participate in this Tribunal. It also indicates that you have made no witness request and by you participating in this Tribunal would like to make an oral statement. Does that answer your question?

Detainee: Yes.

Tribunal President: You may now present any information or evidence you have to this Tribunal and you have the assistance of your Personal Representative in doing so. Do you want to present information to this Tribunal?

Detainee: Yes, my information is with the Personal Representative.

*The Detainee chose to take an oath and was administered the Muslim oath.*

Tribunal President: With the assistance of your Personal Representative you may begin.

Personal Representative: I am going to read each accusation against him and his response. He may decide to add more to that.

3.a. (The detainee is associated with forces engaged in hostilities with the United States or its coalition partners.)

This is not true. I am not associated with Al-Qaida. I have the evidence. If I were an enemy combatant, I would not have bought a round trip airline ticket.

Detainee: When you are done with this point I would like to add something.

Personal Representative: The only reason for my original statements is because I was tortured when I was captured. I was tortured in Kandahar, Kabul, and Bagram by interrogators.

Detainee: I also did not carry any weapons. I did not go to any place that there was fighting and I did not participate in any fighting against the coalition.

Personal Representative: In Kabul, an Afghani interrogator beat me and told me that they would kill me if I didn't talk. They shot and killed someone in front of me and said they would do the same to me if I didn't cooperate. I was also beaten by Iraqi and Egyptian interrogators who were asking me questions and translating to the Afghani interrogator.

Before I was sent to Bagram, the interrogator told me that they would kill me if I didn't talk or send me back to the Afghanis if I changed my story. I was then transferred to Bagram where an America soldier put a gun in my face and threatened to kill me. This soldier threw me to the ground, dragged me by my legs, injured my foot and hit me. I have a scar on my foot to prove it. The interrogator was present at the time. Then they pulled a weapon on me and threatened me. They placed a thin hood covering my head and I was kneeling down at their mercy.

Whatever I said was because I was being tortured and threatened. I told this to the Red Cross in Afghanistan.

Detainee: When I was being beaten by the soldier the interrogator was saying the law was execution.

Personal Representative: I was then transferred to Kandahar. In Kandahar, they took all my clothes and the American soldiers hit me and kept me tied up in the rain for three hours. My hands and feet were tied so tight that I couldn't move my hands for a month and I couldn't move my feet for two weeks. One soldier kicked me in my knee and wounded me. I have a scar to prove it. I told this to the doctor and he was visiting me at night and gave me shots to sleep. I told the Red Cross what was happening to my body and mind. Before I was transferred to Cuba, the barber hit me in the scalp and made me bleed. I probably have a scar there but I can't see it because it is covered with hair. Also, before I went to the interrogator tent, a male and female soldier hit me.

I was then transferred to Cuba. When I got off the airplane, the soldiers hit us. They had us shackled and had our eyes covered. They took off my clothes by the shower. The Red Cross asked them about my head wound. In the first month of detention in Cuba, the soldiers would hit me before bringing me to the interrogator.

Because of the torture I received when I was originally captured, I had to admit to things I didn't do. I said the same thing in Bagram so I would not be sent back to the Afghani who would have killed me.

There was a group of people from my country that visited me here. I told them some of the things and events then the soldiers hit me. This was about a month after I was brought here.

UNCLASSIFIED//~~FOUO~~

At that time, I asked the interrogator for a psychologist and was refused. I told the interrogators that I tried to commit suicide twice. Fortunately, other detainees convinced me that I should not.

After that I met with four American interrogators and told them whatever I said in Kabul, Bagram, and Kandahar was false and that I only said those things because I was being tortured and threatened to be killed.

Some of the interrogators here put pressure on me such as withholding medication and by withholding letters from my family. The letters that I did receive were all marked out so I couldn't read them. Some interrogators were hard and some were soft. So the interrogators could keep their jobs, they tried to force me to admit things and not get to the real truth.

Detainee: There is something I would like to add. This is only a small part of the torture that we were subjected to. The whole time in Bagram, seven to nine days, my hands and feet were bound. They would also make us stay up and not get any sleep.

Personal Representative:

3.a.1. (The detainee, a Saudi Arabian citizen, voluntarily traveled from Riyadh, Saudi Arabia to Afghanistan via Dubai, UAE and Karachi, Pakistan, in August 2001.)

This is true but I went with a friend. I was a mechanical engineering student with three years completed and two years to go and had one month off of school during break. I watched a lot of Hollywood movies and wanted to learn how to use pistols as a hobby. Since there was no place to learn how to use a weapon in my country unless you are a soldier, my friend suggested that we go to Afghanistan during the school break and learn. I had tried to apply to a military college but was not accepted because I was under weight.

I was an engineering student but it is everyone's right to learn how to use a pistol to defend themselves. In my country, there are a lot of robberies where bandits stop you in the middle of the road and rob you of all your money, possessions, and car. So I wanted to learn how to defend myself. As I said, I am a mechanical engineering student and just want to go home and complete my studies. It is a good job to be an engineer.

3.a.2. (The detainee received weapons training at the Al-Farouq training camp.)

Not true. I never went to the Al-Farouq training camp. I said this because of pressure the Afghani's put on me. I never went to this camp. After I was in Afghanistan for about two weeks, September 11th happened.

UNCLASSIFIED//~~FOUO~~

3.a.3. (The detainee received familiarization with the Kalashnikov rifle and a pistol at a house in which he stayed in Kandahar.)

True but I never used the weapon.

Detainee: I was not taught how to use this weapon but someone in front of me was taking apart the weapon and putting it back together.

Personal Representative: A man in the house, Abu Musif Al Miki was disassembling and reassembling the gun.

Detainee: He was in the house, not the owner of the house. This was not his house and he was not teaching me how to use the weapon, he was just disassembling it in front of me.

Personal Representative: These were his weapons. I asked him how he learned to do this and he told me that he was an intelligence person in Saudi Arabia. We left our passports and money at this house for safekeeping because we were told we could be robbed and we were going to pick them up on the way back.

3.a.4. (The detainee traveled to another training camp near Jalalabad, Afghanistan, after Al-Farouq, but the training was cancelled due to the war.)

At this time my friend's friend met up with us. My friend, my friend's friend and myself went to a second house. My friend's friend is the one who knew the way. He was from Saudi Arabia. He met us after two weeks in Afghanistan. I went to the second house so I could learn how to use pistols. We stayed about a week and a half to two weeks at the second house.

At the second house, we were told that they would not bring us to the training camp because they didn't know us. So I wanted to return to my country but had to wait for my passport so I could go to Pakistan, which is close to Jalalabad. So I waited for my passport so I could leave.

3.a.5. (The detainee was captured near the Pakistan border.)

The new government was taking over Jalalabad. I was told that a lot of Arabs were being killed so my friends and I escaped to the mountains, so I wouldn't be killed. I was asking anyone how to get to Pakistan since I didn't have my passport any longer. I was told that all the passports were burned in the attacks. During this time that I was in the mountains, I lost my two friends. I joined up with other people trying to flee to Pakistan and we were attacked. We got to the village of Samer Kheer, when Afghanis kidnapped me and others and demanded money to be released. Some of the others were able to buy their freedom by having people send money, but I didn't have any money so I was kept in captivity.

UNCLASSIFIED//FOUO

So that is how I ended up being captured by the Afghanis and then tortured to saying things that were untrue or be killed.

I just want to go back and finish my school. I have no hatred against anybody or any country or toward America. Just the opposite, the Americans helped us against Sadam Hussein when he attacked my country.

Tribunal President: Does this conclude your statement?

Detainee: Yes, this is the end.

Tribunal President: Thank you for your testimony. Personal Representative do you have any additional questions for the detainee?

Personal Representative: No sir.

Tribunal President: Recorder do you have any questions for the detainee?

Recorder: No sir.

Tribunal President: Do any Tribunal Members have questions for the detainee?

Tribunal Members: Yes sir.

Tribunal President: If we may we have some questions.

Detainee: I don't mind.

### Summarized Answers in Response to Questions by the Tribunal Members

Q.    Before you left Saudi Arabia to go to Afghanistan you were a student there?

A.    Yes, I was an engineering student

Q.    Were you employed as well as being a student?

A.    Sometimes, I was mainly a student, but sometimes I would drive a car for fare.

Q.    And you said your friend suggested to you to go to Afghanistan to get training for personal protection?

A.    Yes.

Q.    How would you know how to get from Saudi Arabia to Afghanistan?



UNCLASSIFIED//FOUO

A.    My friend knew the way.

Q.    Were you able to finance the trip yourself or did you have help from other people?

A.    It was my own money.

Q.    Did you know prior to leaving Saudi Arabia that Afghanistan was in the middle of a civil war?

A.    I knew that in most of Afghanistan it was safe.

Q.    Had you ever heard of religious leaders in Saudi Arabia who were urging young men to go fight on behalf of the Taliban?

A.    No, I was engrossed in my studies and not concerned with this. My parents were also living in a village and I didn't have access to any news.

Q.    When did you first learn what Al-Qaida was?

A.    I never knew of it, but heard about it in the news. I heard about it when we were in Afghanistan, after the events in America.

Q.    And Usama Bin Laden, the same?

A.    I just heard it on the news.

Q.    We heard there were many Saudis who were quite sympathetic to him, he being a native Saudi himself.

A.    I heard about it in the news. I did not know this person or his ideas. Because he was outside my country I was not concerned with his ideas. There were problems between him and my country.

Q.    Do you consider yourself to be an observant Muslim?

A.    I follow some things in my religion and some things I don't believe in so I don't follow them. I don't know very much about my religion.

Q.    Turning to the point were you said you observed someone else assembling and disassembling a weapon in Kandahar, Abu Musif Al Miki I believe is the name you gave us?

A.    Yes.

UNCLASSIFIED//FOUO

Q.   He was one of the people that stayed in the house with you?

A.   I saw him in the house.

Q.   How many others were in the house?

A.   I am not sure, but I think it was him, two people with him and us three.

Q.   Was it not a house for people with Arabic heritage like yourself?

A.   No, I just went there with my friends.  It was not a meeting place for Arabs.

Q.   Did you see Arabs there who were fighters?

A.   I don't know any fighters.

Q.   Please explain the circumstances of your capture, when the Pakistanis captured you.

A.   On the Pakistani border?

Q.   Yes.

A.   When we were captured there were Afghanis that were asking for money.  So they could set us free.  Some people spoke to the Afghans and they made an agreement.  The Afghans said you could buy your freedom; they did and were let go.  I had no money so they gave me to the new government.  I knew they traded me for money.

Q.   Perhaps we are mistaken but I thought you said when you finally made it to Pakistan after traveling that you were by yourself.

A.   When I got there or when I left Afghanistan to go to Pakistan?

Q.   We understood that when you left Afghanistan at the beginning of your trip you had people with you.

A.   Yes I had my friend.

Q.   But he did not finish the trip with you.

A.   When we got into Afghanistan…Can you please clarify the question?

Q.   When you arrived at the border of Afghanistan and Pakistan, how many people were with you?



UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

A.    I am not sure of the number, but there were a number of people with me.

Q.    And you mentioned you no longer had your passport.

A.    Yes, I didn't have my passport.  I heard it had been burned so I wanted to go to the embassy.

Q.    When you were first jailed in Pakistan did you have an opportunity to meet with any Saudi representatives from the embassy?

A.    I was not jailed in Pakistan.  When I got to the borders highway robbers took me.

Q.    So you never made it into Pakistan at all?

A.    No.

Q.    Concerning the allegations of torture you made, do you believe you were tortured because you did not say what the interrogators wanted you to say or because you were not speaking at all?

A.    The interrogators would tell me the accusations, I would start to answer, then they would beat me until I said yes.

Q.    Did you try to resist them in anyway?

A.    No.

Q.    You said you are a mechanical engineering student, what was your discipline or specialty in?

A.    There are phases; the first three years are general, and the last two years you would specialize in an area.

Q.    How to make heavy objects move around?

A.    No, I studied physics, mathematics, statistics, and dynamics.

Q.    You had your own money.

A.    Yes.

Q.    So you paid for your room and board at the first house?

A.    The first house, where, what are you asking?

UNCLASSIFIED//FOUO



UNCLASSIFIED//FOUO

Q.   You went to a house in Afghanistan, the first house you went to receive training with the rifle.

A.   I did not receive training on the rifle.  I wanted training on the handgun.

Q.   There was a second house you were going to go to.

A.   Yes.

Q.   What did you pay for room and board at the first house?

A.   I would buy my food from the supermarket; I didn't need to pay for that.

Q.   For sleeping?

A.   You just sleep there.

Q.   Then you were going to go to the second house.

A.   Yes.

Q.   But you left your passport and money at the first house?

A.   Yes.

Q.   How were you going to pay for your food at the second house?

A.   I had about $200.00 with me.

Q.   $200.00 American dollars?

A.   Yes.

Q.   So there was more money back at the first house?

A.   Yes with my passport.

Q.   Did you talk with people at the first house or the second house so they knew your background?

A.   No, I just said my intentions were to train, they didn't know me.

Q.   No one knew you were an engineering student?

A.   Only my friend from Saudi Arabia.

ISN# 332
Enclosure (3)
Page 9 of 14



UNCLASSIFIED//FOUO

Q.    Did anyone ask you for any assistance or information that you could give them about engineering or anything like that?

A.    No.  I was cautious and didn't want anybody to know but my two friends.

Q.    You seemed very cautious to keep your background, private; did you think it was dangerous to go to Afghanistan?

A.    No, it was just normal not to blend in with people.

Q.    How much did it cost to get to from your home to Afghanistan?

A.    I left with about $1200.00

Q.    With the $1200.00, tickets for transportation were purchased?

A.    Yes, round trip.

Q.    Your friend that traveled with you to Afghanistan is he also a student in Saudi Arabia?

A.    Yes, I heard he was a student.

Q.    And he also wanted to travel to Afghanistan to get the self-defense and handgun training?

A.    Yes.

Q.    How long was your break from school that would allow you to travel from Afghanistan and back?

A.    One month.

Q.    How long did you end up staying in Afghanistan before you were captured?

A.    I'm not exactly sure, but like I told you, I got into Afghanistan two weeks before the attacks of September 11th.  I was late because I didn't have my passport.  I got captured by the Afghanis about two weeks after the fall of Jalalabad.  After that it was the holiday and we were in the Afghani prison.

Q.    So that was about two months in Afghanistan.

A.    Coming from Saudi Arabia, I wasn't in Pakistan for more than two weeks.

UNCLASSIFIED//FOUO

Q.   Afghanistan?

A.   Pakistan.

Q.   I'm concerned about the time when you got to Afghanistan in August of 2001, and then until November when you were captured. After 9/11 why did you not try to leave Afghanistan and get back to Saudi Arabia a lot sooner?

A.   I left Saudi Arabia in August, I was in Pakistan for about two weeks then I went to Afghanistan. Then two weeks after I got to Afghanistan the September 11th attacks occurred. Also, the reason I was held up in Afghanistan was because I lost my passport and I did not know which way to get out. When I heard about the attacks of September 11th, I did not think that the people of Afghanistan had anything to do with it or were involved with it. Also, when the bombings started in Afghanistan, I thought that the Americans knew that certain individuals where associated with Al Qaida. I thought that Al Qaida had planes, I thought they had forces. I thought the Americans knew they were the enemies and that I would not be affected by it.

Q.   Could you and your friend not have received the self-defense training and handgun training is Saudi Arabia?

A.   I told you before, that I had tried before and applied for acceptance into the military academy and was rejected and verified this with Saudi Arabia. My applications did not.

Q.   The only place that you were aware of for you and your friend could receive this training was to go to Afghanistan?

A.   I did not know anything, my friend suggested Afghanistan. If I had known of another place to receive training I would have went, but my friend said let's go to Afghanistan.

Q.   Where is your friend now?

A.   I told you when I was going through the mountains I lost my two friends and just wanted to get out of there quickly.

Q.   How did you become separated with your two friends?

A.   We left for Jalalabad, at dusk. So I heard that some people wanted to go to Pakistan, so I joined them. But I lost my friends at that time.

Q.    When you were at the first house going to the second house, you said you did not talk much to the people there, you were private, why would you leave your money and passport with people you did not know well?

A.    My friend's friend is the one that said the honor in our religion is that no one can trick you because you are Muslim. He mentioned the highway robbers so I took it as (inaudible).

Q.    You told us earlier that there was a great deal of crime in Saudi Arabia, people stopping and robbing you on the road.

A.    Yes. But know in Afghanistan or Saudi Arabia, you hear every month or two months that there is crime especially on the roads leading from the cities into the villages. You might have heard in Saudi Arabia about five years ago, there was a task force set up to fight these highway robberies and crimes. Also, I told you that my parents were living in a village and that most of the times they were on the roads between the village and the cities. Also, there is a lot of crime and highway robbery in the places that I live in.

Q.    My point was that the same things happen in both Saudi Arabia and Afghanistan and everywhere else. It seems unusual for us to believe that these things could happen in Saudi Arabia, why could they not happen in Afghanistan as well?

A.    I thought that when I went to Afghanistan, I would be there for a short time, get the training and return. My friend said I would only be there for a short while and he didn't think there would be any problems with robbers or crime for that time. Someone going to Afghanistan should only be afraid of the robbers on the roads while traveling between cities. I didn't think I would be in Afghanistan wandering around, I thought I would be in one place. I didn't know there where robbers like those in Saudi Arabia until I arrived in Afghanistan.

Q.    I just seems as though you are a person in a strange country who doesn't know anyone, and the most important things to you in order to leave, like money and passport, are given to people you don't know or trust for safekeeping.

A.    This is something that my friend's friend suggested to us and told us it was better to leave the documents with these people and it would be safe. Due to religion they would not take it. In our religion, it is said that if someone gives you something for safe keeping, you will trust them to keep and not do anything with it until they return.

Q.    When you said you were leaving Jalalabad at dusk, your friends were with you when you started you trip or not?

A.    Yes.

UNCLASSIFIED//FOUO

Q.    At what point did you lose track of them?

A.    When we were going through the mountains.

Q.    Were you with a large group or small group of people?

A.    Small group.

Q.    I would think that the three of you would have liked to stay together while traveling.

A.    Yes, correct. I insisted that we leave Afghanistan quickly, but they said wait until we find someone that knows the way. The people that I was with, the group leaving Afghanistan did not really know which way they were going, they were just trying to find a way through the villages to go to Pakistan. And I was very careful to leave quickly.

Q.    Your friends were delayed because they were trying to find the proper guide?

A.    Yes, they said wait so we can find someone that knows the way.

Q.    You did not want to wait for them to do that?

A.    Correct. I just wanted to leave.

Q.    You were hoping they would catch up to you at some point?

A.    No, I was hoping that they would get out, but I was insistent and very concerned with leaving.

Q.    So you left with a group of refugees that may or may not have known where they were going.

A.    Yes, they were going through the villages in the direction of Pakistan.

Q.    When your friend said to wait for a guide who knows the way, you never saw them after that?"

A.    No, we got separated.

Q.    And to this day you do not know what happened to them?

A.    No, I don't know. Maybe my country knows, but I don't know.

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

Q.   What is your friend's name?

A.   It is in my interrogation files. The description and everything is in the interrogation folders. Do you want me to give you the names now? Haider Dalnajdi, the other one Abou al Haigaa.

Tribunal President: Do you have any other evidence you wish to present to this Tribunal?

Detainee: No.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, U.S. Marine Corps
Tribunal President

## DETAINEE ELECTION FORM

**Date:** 8 Oct 2004

**Start Time:** 0830 hrs

**End Time:** 1030 hrs

**ISN#:** 332

**Personal Representative:** ▮▮▮▮▮▮▮▮▮▮
(Name/Rank)

**Translator Required?** YES          **Language?** ARABIC

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

-----------------------------------------------------------------------

## Detainee Election:

[X]   **Wants to Participate in Tribunal**

[ ]   **Affirmatively Declines to Participate in Tribunal**

[ ]   **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee was very cooperative and made a lengthy oral statement that he wishes to make to the tribunal. A follow-up interview is required. No witnesses requested.

Personal Representative: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Exhibit D-a

UNCLASSIFIED

## Combatant Status Review Board

TO: Personal Representative

FROM: OIC, CSRT (27 September 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal - AL TAYABI, Abdullah.

1.  Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2.  An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3.  The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that he is a associated with forces engaged in hostilities with the United States or its coalition partners.

   a. The detainee is associated with forces engaged in hostilities with the United States or its coalition partners:

      1. The detainee, a Saudi Arabian citizen, voluntarily traveled from Riyadh, Saudi Arabia to Afghanistan via Dubai, UAE and Karachi, Pakistan, in August 2001.

      2. The detainee received weapons training at the al Farouq Training Camp.

      3. The detainee received familiarization with the Kalishnikov rifle and a pistol at a house in which he stayed in Kandahar.

      4. The detainee traveled to another training camp near Jalalabad, Afghanistan, after Al Farouq, but the training was cancelled due to the war.

      5. The detainee was captured near the Pakistan border.

4.  The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

Memorandum                    UNCLASSIFIED



| | | | | |
|---|---|---|---|---|
| To | : | Department of Defense | Date | 09/21/2004 |
| | | Office of Administrative Review | | |
| | | for Detained Enemy Combatants | | |
| | | Col. David Taylor, OIC, CSRT | | |

From :     FBI GTMO
          Counterterrorism Division
          Asst. Gen. Counsel ▓▓▓▓▓▓▓▓

Subject   REQUEST FOR REDACTION OF
         NATIONAL SECURITY INFORMATION
            J332DP

      Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

    CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

      The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

      The following documents relative to ISN 332 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 07/25/2002

---

    [1]Redactions are blackened out on the OARDEC provided FBI document.

    [2]See Executive Order 12958

UNCLASSIFIED

Exhibit 22

182

UNCLASSIFIED

Memorandum from ████████ to Col. David Taylor
Re:   REQUEST FOR REDACTION, 09/21/2004


        If you need additional assistance, please contact
Assistant General Counsel ███████████ ████████████ or Intelligence Analyst ████████

████Intelligence Analyst █████████████████████

UNCLASSIFIED

212

UNCLASSIFIED//FO(U)O

## Personal Representative Review of the Record of Proceedings

I acknowledge that on __22__ October 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #332.

✓ I have no comments.

___ My comments are attached.

_____
Name

_22 Oct 2004_
Date

_____
Signature

ISN #332
Enclosure (5)

UNCLASSIFIED//FO(U)O