APPROVED FOR PUBLIC FILING BY CSO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENDER AYED HAMOUD HEZAM AL-OTEIBI AL-SHABANY *et al.*, | ) ) ) | |
| Petitioners/Plaintiffs, | ) ) | |
| v. | ) ) | No. CV. 05-2029 (JDB) |
| GEORGE W. BUSH *et al.*, | ) ) ) | |
| Respondents/Defendants. | ) | |

**PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES
(1) IN OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES RELATED
TO REVIEW OF CERTAIN DETAINEE MATERIALS, AND
(2) IN SUPPORT OF PETITIONERS' MOTION FOR IMPOSITION OF SANCTIONS
AND IMMEDIATE RETURN OF
CONFISCATED ATTORNEY-CLIENT MATERIALS**

Dated:  July 24, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND............................................................................................ 3

ARGUMENT..................................................................................................................... 5

I.  THE GOVERNMENT'S SEIZURE AND EXAMINATION OF MR. AL-SHABANY'S
LEGAL PAPERS WAS UNLAWFUL ...................................................................... 5

  A.  In Seizing Mr. Al-Shabany's Legal Papers, the Government Violated the Plain
Terms of a Court Order........................................................................................ 6

  B.  The Government Has Failed to Make an Individualized Showing Supporting
Its Impoundment of Mr. Al-Shabany's Legal Papers.......................................... 9

  C.  The Government Has Interfered with Petitioner's Access to Counsel................ 16

II.  THE GOVERNMENT SHOULD BE SANCTIONED............................................. 17

III. THE RESPONDENTS' MOTION FOR THE USE OF A FILTER TEAM SHOULD BE
DENIED...................................................................................................................... 20

IV. IN THE ALTERNATIVE, PETITIONERS SHOULD BE PERMITTED TO UNDERTAKE
LIMITED DISCOVERY, AND ANY FURTHER REVIEW OF MR. AL-SHABANY'S
LEGAL PAPERS SHOULD BE CONDUCTED BY THE COURT OR A SPECIAL
MASTER ................................................................................................................... 24

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

Adem v. Bush,
425 F. Supp. 2d 7 (D.D.C. 2006) ................................................................19

Al-Anazi v. Bush,
370 F. Supp. 2d 188 (D.D.C. 2005) ...............................................................8

Al Odah v. United States,
346 F. Supp. 2d 1 (D.D.C. 2004) ................................................6, 8, 9, 21, 23

Bach v. Illinois,
504 F.2d 1100 (7th Cir. 1974) ......................................................................7

Black v. United States,
172 F.R.D. 511 (S.D. Fla. 1997) ..................................................................20

Carter v. Hutto,
781 F.2d 1028 (4th Cir. 1986) ......................................................................10

Doe v. United States,
82 Fed. Appx. 250 (2d Cir. 2003) ..................................................................9

Goff v. Nix,
113 F.3d 887 (8th Cir. 1997) ........................................................................10

In re Grand Jury Subpoenas 04-124-03 and 04-124-05,
Nos. 05 2274/2275, 2006 WL. 1915378 (6th Cir. July 13, 2006) .........................21, 22

In re Grand Jury Subpoenas Duces Tecum,
798 F.2d 32 (2d Cir. 1986) ...........................................................................9

Hiney v. Wilson,
520 F.2d 589 (2d Cir. 1975) .........................................................................10

Johnson-El v. Schoemehl,
878 F.2d 1043 (8th Cir. 1989) ......................................................................7

Lonegan v. Hasty,
No. 04 CV 2743 (NG) (VVP), 2006 WL 1707258 (E.D.N.Y. June 22, 2006) ...............8

Procunier v. Martinez,
416 U.S. 396 (1974) ...................................................................................7

Rasul v. Bush,
542 U.S. 466 (2004)....................................................................................18

In re Sealed Case,
107 F.3d 46 (D.C. Cir. 1997)..........................................................................9

In re Search of the Scranton Housing Authority,
No. 04-MISC NOs. 318-322, 2006 WL 1722565 (M.D. Pa. June 22, 2006) ...............................20

Simmons v. Dickhaut,
804 F.2d 182 (1st Cir. 1986)..........................................................................10

United States v. Abbell,
914 F. Supp. 519 (S.D. Fla. 1995) ...................................................................20

United States v. Neill,
952 F. Supp. 834 (D.D.C. 1997)......................................................................21

United States v. Skeddle,
989 F. Supp. 890 (N.D. Ohio 1997)....................................................................9

United States v. Stewart,
No. 02 CR 396, 2002 WL 1300059 (S.D.N.Y. June 11, 2002) ..............................................10, 21

United States v. Zolin,
491 U.S. 554 (1989)....................................................................................9

Wright v. Newsome,
795 F.2d 964 (11th Cir. 1986) ........................................................................10

## REGULATIONS

DoD Regulation 5200.1 ................................................................................12

DoD Regulation 5400.7-R ..............................................................................12

## MISCELLANEOUS

Mark Denbeaux, The Guantanamo Detainees During Detention, Data from Department of
Defense Records, July 10, 2006..........................................................................11

Michael Gordon, Officer Expects More Suicides, Charlotte Observer, June 12, 2006...................3

Sgt. Sarah Wood, Three Guantanamo Bay Detainees Die of Apparent Suicide, Am. Forces
Press Svc., June 10, 2006..............................................................................3

Charlie Savage, <u>Guantánamo Detainees Find Fault with Lawyers</u>, Boston Globe,
Aug. 10, 2005, A1 ................................................................................................................19, 22

Petitioners Bender Al-Oteibi Al-Shabany ("Al-Shabany") and Ayed Al-Oteibi Al-Shabany, as Next Friend (collectively "Petitioners"), respectfully submit this Memorandum of Points and Authorities (1) in Opposition to Respondents' Motion for Procedures Related to Review of Certain Detainee Materials, and (2) in Support of Petitioners' Motion for Imposition of Sanctions and Immediate Return of Confiscated Attorney-Client Materials.  Petitioners oppose Respondents' motion.

## PRELIMINARY STATEMENT

After indiscriminately seizing personal items and papers from the prisoners at Guantánamo – including unquestionably privileged legal communications – without authorization by the Court or notice to counsel, Respondents now move the Court, a month after the fact, to approve their actions and to establish procedures whereby representatives of the government will methodically review the substance of privileged documents.

As a matter of fundamental principle, and by the protective order entered by this Court, all privileged attorney-client communications were supposed to be secure against seizure and review by the government.  The government's unilateral confiscation of such communications was illegal.  And the government's failure to disclose its actions to counsel and the Court until weeks after the fact is inexcusable.  In the name of investigating three prisoner deaths, the government has trampled on a fundamental privilege and shattered any confidence that Mr. Al-Shabany might still have had that his communications with counsel would be safe from the government's prying eyes.

At bottom, the government asks the Court simply to take its word that its extreme actions were justified.  The government claims that the substance of a few, discrete communications it seized and reviewed in the first days after the deaths of the prisoners warrants the wholesale

seizure and review of all materials in the possession of every prisoner at Guantánamo except for the few designated as no longer enemy-combatants. Yet the government withholds critical details about these communications from the Court and counsel, and does not even try to tie any of the purportedly suspect materials to our client, Bender Al-Shabany.[1]  Without examining these communications, the Court cannot possibly determine whether the vague, general justifications proffered by the government are valid or simply a pretext for collecting information from Mr. Al-Shabany and undermining the attorney-client relationship.  The stakes are too high for the Court simply to accept the untested factual assertions that form the basis of the government's motion.  Respondents' motion should be denied.

We respectfully request that the Court take the following actions to address the government's unlawful conduct.  First, we ask that the Court order the government to immediately return Mr. Al-Shabany's legal materials and destroy any copies it has made.  Next, we ask that the Court order Respondents to file a declaration under oath of an individual with actual knowledge concerning the facts surrounding the seizure, treatment, review and analysis of Mr. Al-Shabany's legal materials so that the Court may evaluate appropriate sanctions.

Alternatively, the Court should authorize limited fact discovery to permit Petitioners to explore the circumstances surrounding the seizure of Mr. Al-Shabany's legal papers and to test, through cross-examination, the broad assertions made by government officials in support of Respondents' motion.  If, on the basis of facts revealed through discovery, the Court decides to

---

[1] Petitioner's name was mis-transcribed in the habeas petition.  His name is more accurately transcribed as Bander Ayed Hamoud Hezam Al-Shaibani Al-Otaibi.  His name is alternatively spelled as Bander Al Otaibi Al Shibani.

permit some review of the materials seized from Mr. Al-Shabany, that review should be conducted by the Court or a special master, not the military or the Department of Justice, and should be narrowly tailored to minimize further invasion of the privilege.

## FACTUAL BACKGROUND

On June 10, 2006, the military reported that three prisoners at Guantánamo had been found dead in their cells.[2]  The military promptly reported the prisoners' deaths as suicides.[3] According to the declarations of Navy Rear Admiral Harry B. Harris, who serves as the commander of Joint Task Force-Guantánamo, and Special Agent Carol Kisthardt of the Naval Criminal Investigative Service ("NCIS"), the NCIS thereafter initiated an investigation to determine "the manner and cause of death" of the three prisoners.[4]

The NCIS initially searched the cells of the deceased prisoners.  Then after finding a handwritten note in the mesh wall of one deceased prisoner's cell which "appeared to have been written by someone using a name different than" the deceased written on notepaper stamped "Attorney Client Privilege," the NCIS searched the other occupied cells on that cell block.  In that search, the NCIS apparently found notes in the cell of one prisoner which "were considered to be relevant to the investigation,"  and were "potentially authored by at least two of the

---

[2] Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte Observer, June 12, 2006, *available at* http://www.charlotte.com/mld/charlotte/news/14797522.htm.  (Attached hereto as Exhibit A).

[3] *See e.g.*, Sgt. Sarah Wood, *Three Guantanamo Bay Detainees Die of Apparent Suicide*, American Forces Press Svc., June 10, 2006 *available at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html. (Attached hereto as Exhibit B).

[4] Declaration of Rear Adm. Harry B. Harris ("Harris Decl.") ¶ 2; *see also* Declaration of Special Agent Carol Kisthardt ("Kisthardt Decl.") ¶ 2.

deceased detainees." Some portion of these notes were written on stationary with stamps indicating that the materials were attorney-client materials.[5]

Then without notice to the Court or to habeas counsel, beginning on June 14, the NCIS searched the cells of "all enemy combatants throughout the Guantanamo detention facility" and seized approximately 1100 pounds of materials, including written communications between Guantánamo prisoners and their lawyers.[6]

Further on June 18, 2006, the NCIS "began sorting materials" seized from eleven (unnamed) prisoners which included "separating Attorney Client privileged information from non-privileged information." Carol Kisthardt reported that she "looked at the contents" of three envelopes that "were marked as attorney-client privileged information." She then suspended review for, among other reasons, "guidance regarding the handling of purported attorney-client material."[7]

Two weeks later, on June 30, 2006, Terry Henry notified all habeas counsel by email that "on or about June 14, 2006 documents of all detainees classified as enemy combatants including legal mail," had been seized. (Attached hereto as Exhibit C). On July 7, 2006 Respondents filed their Motion for Procedures Related to Review of Certain Detainee Materials, providing notice to this Court of the seizures for the first time. In its motion, the government seeks authorization by the Court to retain the confiscated materials and to create a "Filter Team" composed of

---

[5] Kisthardt Decl. ¶ 3.

[6] Kisthardt Decl. ¶ 4.

[7] Kisthardt Decl. ¶ 5.

- 4 -

Department of Defense attorneys, intelligence, or law enforcement personnel and translators who will analyze these materials.[8]

The government still has not provided a list of the prisoners from whom materials were taken. Nevertheless, since it describes in its motion a sweeping search of "*all* materials in *all* enemy combatant detainees' cells"[9] and has filed a motion in this action we must assume that legal papers belonging to our client, Bender Al-Shabany, are among the materials confiscated by the NCIS.[10]

## ARGUMENT

## I.     THE GOVERNMENT'S SEIZURE AND EXAMINATION OF MR. AL-SHABANY'S LEGAL PAPERS WAS UNLAWFUL.

There can be no doubt that the government's course of conduct, which it now asks the Court to condone, was unlawful. The impoundment of Mr. Al-Shabany's legal papers violated

---

[8] *See* Resp Mot. at 10.

[9] Respondents' Motion for Procedures Related to Review of Certain Detainee Materials and Request for Expedited Briefing ("Resp. Mot."), at 6 (emphasis added); *see also id.* at 2 n.2 ("The ongoing NCIS investigation will involve review of materials of all Guantanamo Bay detainees . . . .").

[10] This inference is further supported by the fact that on July 20, 2006, the government withdrew its motion in a number of other cases – not including this one – on the grounds that, "it has been determined that petitioners have not had attorney-client materials impounded for purposes of the ongoing investigation by the [NCIS] described in the motion, or because respondents have been unable to identify petitioners as detainees currently detained at Guantanamo." Notice of Withdrawal of Respondents' Motion for Procedures Related to Review of Certain Detainee Materials and Request for Expedited Briefing, July 20, 2006, at 3. (Attached hereto as Exhibit D).

the plain terms of the governing Protective Order and related access procedures in this case.[11]

Furthermore, independent of the Protective Order, the law requires the government to make a

particularized showing before it encroaches upon the attorney-client privilege. Yet, even now,

long after its seizure of the materials, the government has not pointed to a single, particularized

fact justifying its confiscation of Mr. Al-Shabany's legal materials. The Court should not ratify

the government's unlawful conduct by permitting it to further review the privileged

communications it has seized.

A.    **In Seizing Mr. Al-Shabany's Legal Papers, the Government Violated the Plain Terms of a Court Order.**

As this Court has recognized in the specific context of the Guantánamo litigation, "[t]he

privilege that attaches to communications between counsel and client has long held an

exceptional place in the legal system of the United States."[12]  The Supreme Court has recognized

that the attorney-client privilege is "the oldest of the privileges for confidential communications

known to the common law." "Its purpose is to encourage full and frank communication between

attorneys and their clients and thereby promote broader public interests in the observance of law

and administration of justice."[13]

---

[11] On November 17, 2005 (dkt. 11) this Court entered the Amended Protected Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba ("Protective Order") and the Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba ("Rev. Proc."), among other orders. (Attached hereto as Exhibit E).

[12] *Al Odah v. United States*, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

[13] *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383; 389 (1981)).

Nowhere is the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[14] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[15] Indeed, even for prisoners who have actually been convicted of crimes, the Supreme Court has held that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."[16]

For a prisoner like Mr. Al-Shabany – who is being held in a foreign country, thousands of miles from home, without being charged, and who seeks to work with his counsel to challenge his detention – the foregoing principles have particular resonance. This Court has ruled that prisoners held at Guantánamo have a right to representation by and access to counsel and that "the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications

---

[14] *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[15] *Bach*, 504 F.2d at 1102.

[16] *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

between them".[17] This Court has also gone to great lengths to protect that privilege by entering

the Protective Order and related access procedures (dkt. no. 11), which are intended to preserve

the confidentiality of attorney-client communications.[18] From the outset, the government sought

permission to monitor the substance of such communications, but that request was squarely

rejected by the Court.[19]

The government effectively concedes that it has violated the Protective Order and

accompanying access procedures, admitting (albeit with characteristic understatement) that the

seized materials "will likely include some number of attorney-client communications potentially

subject to attorney-client privilege."[20] In drawing up the access procedures, the Court ruled that

the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client

---

[17] *Al Odah*, 346 F. Supp. 2d at 5; *see also Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 200 (D.D.C. 2005) (Bates, J.) (recognizing that factual returns are "necessary for petitioners' counsel effectively to represent petitioners").

[18] As the government acknowledges, "the Protective Order contemplates that communications between habeas counsel and their clients 'for purposes of litigating the cases' generally take place in a privileged context." Resp. Mot. at 9. For instance, the access procedures establish a system for delivering legal mail to prisoners that protects the privileged substance of communications. Rev. Proc. § IV.A., B. Similarly, the access procedures expressly prohibit the government from eavesdropping on oral communications between prisoners and their counsel at the prison. *Id.* § X.F.

[19] See *Al Odah*, 346 F. Supp. 2d at 11. *See also Lonegan v. Hasty*, No. 04 CV 2743(NG)(VVP), 2006 WL 1707258 (E.D.N.Y. June 22, 2006) ("Detainees' status as persons of interest in the government's investigation of September 11th does not render [their counsel's] expectation of privacy in their communications with Detainees unreasonable. That an individual is held in connection with the investigation of terrorist acts does not render that individual-or his or her attorney-ineligible for the protections of the Fourth Amendment.").

[20] Resp. Mot. at 9.

- 8 -

privilege.[21] Yet, in impounding Mr. Al-Shabany's legal papers, this is precisely what the government has done. This egregious violation of a court order is reason enough to order the immediate return of the impounded materials.

**B.    The Government Has Failed to Make an Individualized Showing Supporting Its Impoundment of Mr. Al-Shabany's Legal Papers.**

Even in the absence of the Protective Order which prohibits the government's review of Mr. Al-Shabany's legal papers, on the present record the government's indiscriminate seizure of materials in this case was plainly unlawful.

Courts have consistently required the government to make a specific, *individualized* showing that there is a sufficiently compelling justification for invading the attorney-client privilege. For example, where the government seeks to invoke the crime-fraud exception to the attorney-client privilege, it bears the burden of showing probable cause that the client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[22] Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by

---

[21] See *Al Odah*, 346 F. Supp. 2d at 5.

[22] *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also Doe v. United States*, 82 Fed. Appx. 250, 252 (2d Cir. 2003) (vacating contempt order where government failed to meet burden of showing that crime-fraud exception applied); *United States v. Skeddle,* 989 F.Supp. 890, 901 (N.D. Ohio 1997); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to attorney-client communications), *cf. United States v. Zolin*, 491 U.S. 554, 572 (1989) ("Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.") (internal quotation marks and citations omitted).

demonstration of probable cause and a warrant *prior to the seizure*, and the government must

employ appropriate means of screening out privileged materials.[23]  The standard that applies to

seizure of an inmate's legal papers is similarly demanding.  "The taking of legal papers will

often (though perhaps not always) interfere with an inmate's right of access to the courts. . . .

[T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can

only be justified if it is *reasonably related* to a *legitimate penological interest*."[24]  Here, the

government's vague allegations in support of its motion do not satisfy this substantial burden.

To begin, it is not clear that the government is pursuing a "legitimate penological

interest" in seizing and seeking to review Mr. Al-Shabany's legal papers.  The government

insists that it has impounded the prisoners' legal papers "in order to investigate fully the

circumstances surrounding the deaths of the three detainees and to determine whether other

suicides were planned or likely to be planned."[25]  However, we submit that it is an open question

whether, in confiscating the prisoners' legal materials, the government was truly investigating a

suicide plot, or using the deaths as a pretext to gain access to materials that heretofore have been

---

[23] *See, e.g., United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *3 (S.D.N.Y. June 11, 2002) (appointing a special master to review materials from office of attorney).

[24] *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (emphasis added); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183-84 (1st Cir. 1986); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986); *Carter v. Hutto*, 781 F.2d 1028, 1031-32 (4th Cir. 1986); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975).

[25] Resp. Mot. at 6.

off-limits.[26]  We have nothing more than the untested declarations of interested individuals to go on.[27]

In any event, even if the government has identified a legitimate penological interest in investigating the circumstances of the prisoners' deaths, it has utterly failed to show that its proposed remedy – the unrestricted seizure and review of Mr. Al-Shabany's legal materials – is reasonably related to that interest.  The government has not presented any specific evidence that *Mr. Al-Shabany* misused, or is expected to misuse, any of his attorney-client materials.  In fact, the government does not even mention Mr. Al-Shabany's name in its briefing.  Rather, to justify its course of action in this matter, the government points to the same generic evidence it relies on in every other Guantánamo case in which it filed this motion – a handful of documents of unknown substance seized from several unnamed prisoners.  For the reasons set forth below, none of this suffices.

*First*, the government asserts that it discovered a document labeled "FOUO" in an envelope "marked as attorney-client privileged information."[28]  This fact completely belies the

_____

[26] It is a distressing truth that there have been numerous previous suicide attempts by detainees, including a 2003 incident referred to in the press by military officials as a "mass hanging."  In the past, however, the government has consistently sought to minimize such concerted activity and has resisted any systematic inquiry into prisoners' mental health.  *See e.g.,* Mark Denbeaux, *The Guantanamo Detainees During Detention, Data from Department of Defense Records*, at 1-2, 13, July 10, 2006 (2003 suicide attempts not reported until 2005).  The government's history of indifference sharply contrasts with its current contention that the search for further "plots" justifies ransacking the prisoners' legal papers.  (Attached hereto as Exhibit F.)

[27] Rear Admiral Harris's four-paragraph declaration, for instance, appears to have been premised entirely on hearsay.  Harris Decl. ¶ 3 ("*I was advised* that NCIS had obtained information which suggested the suicides may have been part of a larger plan or pact for more suicides that day or in the immediate future.") (emphasis added).

- 11 -

government's contention that it set aside privileged information and only scanned non-privileged information.[29] Moreover, this document is a red herring. "FOUO," or "For Official Use Only," stamps are *not* classification designations; documents so labeled are not necessarily sensitive in any manner. "FOUO" is simply an internal Department of Defense designation concerning the Freedom of Information Act ("FOIA"). "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ."[30] The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[31] and in fact "is, by definition, unclassified."[32] The Protective Order does not prevent prisoners from being in possession of FOUO documents. Such documents by definition represent no security risks, and there is accordingly no reason why a prisoner should not legitimately be in possession of such documents.

    *Second*, the government points to another document it discovered as it sifted through an envelope explicitly marked as privileged, this one bearing a "Secret" stamp that had been lined out and re-marked "Unclassified."[33] Again, however, this is *not* a classified document and

---

[28] Kisthardt Decl. ¶ 5.

[29] *Id.*

[30] DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[31] DoD Regulation 5400.7-R: C4.1.1.

[32] DoD Regulation 5200.1: AP3.2.2.3.2.

[33] Kisthardt Decl. ¶ 5.

therefore should be of no concern to NCIS investigators. (The government, of course, has failed to provide counsel or the Court with a copy of this document, so we can only make an educated guess about the nature of the formerly "Secret" document.) Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified and that the document was declassified and marked accordingly. It is standard for such documents to have the original "Secret" stamp crossed out and "Unclassified" written beside it. The Protective Order does not prevent prisoners at Guantánamo from possessing unclassified documents (including unclassified documents that were once "Secret").

*Third*, the government cites, as a basis for reviewing Mr. Al-Shabany's privileged communications, a document discovered among one prisoner's possessions that "contained instructions on tying knots."[34] This document is not alleged to have been found in Mr. Al-Shabany's possession.[35] Nor is it purported to have been marked "attorney-client privileged material" or to have been discovered in an envelope marked as privileged. The document therefore appears to have no relevance to the instant motion, which seeks authorization to review privileged items that have been confiscated by the NCIS.

*Fourth*, the government cites a note handwritten in Arabic on paper stamped "Attorney Client Privilege" that was found in the cell of one of the deceased and purportedly "written by

---

[34] *Id.*

[35] The government states that this document was discovered during a search of materials "pertaining to eleven detainees." *Id.* The government does not say who these prisoners are, or how they were selected.

- 13 -

someone using a name different from the name of the detainee who lived in the cell."[36] Without having reviewed the note, it is impossible for us to assess the validity of the government's assertion that it was written by someone other than the deceased. Among the many details the government fails to provide about this document are the identity of the author (even by his camp and cellblock) and the substance of the note, except the summary allegation that it "was found to be related to the suicides."[37] Even accepting the government's account, however, the purported "abuse" of the privilege system is in no way evident. The entirety of the government's allegation is that a prisoner appears to have used a blank piece of paper provided to him by habeas counsel to write a note. The government does not allege that classified information was conveyed in this note. Nor does the government allege that this note was secreted away in an envelope marked as privileged. To the contrary, the NCIS discovered the note conspicuously tucked in the mesh screening that serves as the wall of the deceased's cell. The government's bare-bones account falls far short of justifying the impoundment of Mr. Al-Shabany's materials.

*Fifth*, the government alludes to Arabic notes "found in the cell of a detainee other than the three suicide victims" (evidently on the same cellblock where at least one of the deceased was incarcerated) which "were considered to be relevant to the investigation and potentially authored by at least two of the deceased detainees."[38] The government does not say how many notes fall into this category, but claims that "many of them" were on "stationery stamped

---

[36] *Id.* ¶ 3.

[37] *Id.*

[38] *Id.*

- 14 -

'Attorney-Client Communication', 'Privileged and Confidential', and 'Attorney-Detainee Materials,' in both English and Arabic."[39]  Again, it is impossible, on that description, to assess whether the government's conclusions are credible.  The government provides absolutely no detail about the substance of the notes.  In any event, the "offense" again seems to be simply that prisoners used stamped paper to write notes.  The government does not say precisely where these notes were discovered and, again, does not allege that they were secreted away among the prisoner's legal materials.  And again, critically, there is absolutely no purported link to Mr. Al-Shabany.  It is not alleged that he was the author of any of these notes (rather, the government says the deceased were the likely authors), nor is it alleged that the notes were found in his cell. It is not even alleged that Mr. Al-Shabany is incarcerated in the same cellblock where these discoveries made.  This vague account does not provide grounds for the seizure of Mr. Al-Shabany's legal papers.

*Finally*, the government has alerted counsel and the Court to a single document that – at least from the government's description of it – likely should not have been in the possession of a prisoner.  Remarkably, however, the document is an *email from JTF-Guantánamo itself*: "an original JTF-GTMO generated email that appeared to contain classified or sensitive information regarding cell location of detainees as well as details concerning camp operational matters."[40] Moreover, like the "knot-tying" document, the government does not even allege this document was found among materials marked "attorney-client" privilege.  The government does not allege

---

[39] *Id.*

[40] *Id.* ¶ 5.

- 15 -

that this document was found in Mr. Al-Shabany's possession, or on his block, or even in his camp.[41] Discovery of this document in an unidentified place in the possession of an unidentified person does not serve as an excuse for the government to rifle through Mr. Al-Shabany's privileged papers.

In sum, the seizure of Mr. Al-Shabany's legal materials was patently improper. The government's bald assertion that the cited documents demonstrate "that detainees had developed practices for misusing the existence of a privileged attorney-client communication system"[42] finds absolutely no support in the record the government has created to date. As described, none of these documents is indicative of abuse by *anyone* of the access procedures established by the Court – much less by Mr. Al-Shabany.

## C.    The Government Has Interfered with Petitioner's Access to Counsel.

The damage done by the government is impossible to exaggerate. Whether the NCIS has actually reviewed Mr. Al-Shabany's legal papers or not, in confiscating these documents, the government has severely undermined, and perhaps destroyed, our ability to communicate freely and openly with our client. The confiscation has no doubt undermined his faith that his communications with counsel are free from government monitoring - striking at the heart of the privilege. In addition, as a practical matter, the NCIS's actions may have completely closed off Mr. Al-Shabany's ability to communicate with counsel. Among other things, unless Mr. Al-Shabany has memorized our address, he now has no way to write us a letter – his only avenue of

---

[41] The government says only that this document was recovered from "one detainee's cell" during a targeted search of the belongings of eleven unnamed prisoners. *Id.*

[42] Resp. Mot. at 8.

- 16 -

communication other than our visits. Moreover, he may no longer have any paper upon which to write us.[43] Even if he can still figure out *how* to write to us, he is impeded in his efforts by lack of access to our previous communications for reference. The government must be ordered to return all materials seized from Mr. Al-Shabany immediately.

## II.    THE GOVERNMENT SHOULD BE SANCTIONED.

For its unlawful actions, the government should be sanctioned. This is not a gray area, subject to competing interpretations of the government's obligations. The government was bound, by the Protective Order and case law, to protect the attorney-client privilege. Instead, it has willfully trampled all over it.

Now, having belatedly disclosed its illegal seizure and examination, the government asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely. But the government comes to the Court not in contrition, but out of necessity. Once habeas counsel became aware of the government's conduct, they began to seek relief from the courts[44] and the government no doubt foresaw a deluge of litigation. By filing

---

[43] The government does not specify whether prisoners have been permitted to retain blank paper upon which to write their counsel. The government dodges this important issue, stating that procedures "at Guantanamo that accommodated detainees . . . for example, permitting counsel to provide detainees with notepaper stamped with attorney-client markings – will be revised going forward to make it more difficult for detainees to abuse the system." Resp. Mot. at 19. The implication is that habeas counsel will no longer be permitted to provide their clients with paper.

[44] Motion to Modify Stay to Direct Respondents to Return Impounded Privileged Legal Material and for Other Relief, *Abdullah v. Bush*, No. 05-00023 (RWR) (filed July 5, 2006). The government states that its instant motion is an opposition to the *Abdullah* motion. Resp. Mot. at 1 n.1.

generic motion papers in multiple Guantánamo habeas cases, the government seeks to preempt further requests for relief by obtaining blanket *post hoc* Court approval of its actions.

No exigency prevented the government from seeking guidance from the Court at the outset. The government's own course of conduct belies any such claim. Respondents concede that the process of collecting and impounding prisoners' material took five days. Prior to commencing this time-consuming project, the government could have easily arranged a conference call with counsel and the Court. Indeed, as news of the prisoners' deaths swirled in the press, we would have welcomed the opportunity to speak with government counsel about Mr. Al-Shabany's health status and the government's intended next steps. At the absolute minimum, the government could have petitioned the Court. Instead, the NCIS stormed ahead with the wholesale seizure of the prisoners' legal papers – and then concealed its conduct from the Court and habeas counsel for weeks. For its part, the Department of Justice either expressly approved this course of action, or failed to establish adequate procedures to prevent it from happening.

The government's conduct has not occurred in a vacuum. At every step in this litigation, the government has sought to thwart the attorney-client relationship. More than four years ago, when the first next-friend habeas petitions were filed on behalf of prisoners, the government responded by asserting that the prisoners had no right to seek relief in federal court and no rights for a federal court to enforce.[45] While these issues were being litigated, the government denied the prisoners any access to counsel. In 2004, the Supreme Court rejected "the proposition of

---

[45] *See e.g., Rasul v. Bush,* 542 U.S. 466, 471 (2004).

- 18 -

Guantanamo Bay as a legal black hole."[46] Unfazed, the government insisted that "detainees' access to counsel existed purely at the pleasure of the government, with restrictions to be imposed as it saw fit."[47] Again, the courts "flatly rejected" the government's position and its effort to impose "significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees."[48] Once counsel were finally granted access to their clients, the government immediately undertook to undermine the attorney-client relationship. Interrogators fueled mistrust of the lawyers among the prisoners by, for example, claiming that prisoners with lawyers will not be released.[49]

The government's impoundment of legal materials is therefore only the latest in a series of steps reflecting utter contempt for, and aimed at undermining, the privileged relationship between Guantánamo prisoners and their attorneys. It is clear from the government's most recent filing that, if permitted, the government will continue its attack on the privilege. The government should be sanctioned for its willful misconduct, and procedures should be established to prevent future encroachment upon the privilege.

---

[46] *Adem v. Bush*, 425 F. Supp. 2d 7, 11 (D.D.C. 2006) (citing *Rasul v. Bush*, 542 U.S. 466 (2004)).

[47] *Id.* at 12.

[48] *Id.*

[49] *See, e.g.,* Charlie Savage, *Guantánamo Detainees Final Fault with Lawyers,* Boston Globe, Aug. 10, 2005, at A1. (Attached hereto as Exhibit G).

## III.    THE RESPONDENTS' MOTION FOR THE USE OF A FILTER TEAM SHOULD BE DENIED.

The wide-ranging, unrestricted review proposed by the government is grossly overbroad and wholly inappropriate. For instance, the government's concerns, as articulated in its motion papers, are largely limited to handwritten, Arabic materials. This means that a large category of typewritten materials (which constitute the bulk of communications from counsel) and materials written in other languages should be eliminated from any future review. Additional limiting parameters are undoubtedly in order.

Moreover, the government's recommendation that one of its own be tasked with reviewing any privileged materials must be rejected out of hand. As the government hints in its brief,[50] courts are very reluctant to entrust attorney-client privileged materials to governmental taint teams. Indeed, even in exigent circumstances "the use of government taint teams has often been questioned or outright rejected by the courts."[51] Just this month, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the

---

[50] Resp. Mot. at 21 n.12.

[51] *In re Search of the Scranton Hous. Auth.*, No. 04-MISC NOS. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006); *see also Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520-21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by search warrant).

attorney-client privilege.[52]  And "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[53]

Especially given the government's history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored attorney-client communications,[54] "it is important that the procedure adopted in this case not only be fair but also appear to be fair."[55]  Here, even more than most cases, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[56]

Concerns about the appearance of propriety are especially important here, given the considerable difficulties that habeas counsel has experienced in gaining the prisoners' trust. Before meeting with counsel in the aftermath of *Rasul*, the prisoners had "been detained virtually incommunicado for nearly three years without being charged with any crime."[57]  Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system."[58]  Worse, as a result of

---

[52] *In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, 2006 WL 1915378, at *10-11 (6th Cir. July 13, 2006).

[53] *Stewart*, 2002 WL 1300059, at *6 (citing cases).

[54] *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[55] *Stewart*, 2002 WL 1300059, at *8.

[56] *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[57] *Al Odah*, 346 F. Supp. 2d at 8.

[58] *Id.*

statements from interrogators and other government personnel, many prisoners suspect that their civilian attorneys are interrogators in disguise.[59]  These suspicions will only intensify if the prisoners learn that their attorney-client materials are being reviewed by lawyers for the same military that incarcerates and interrogates them.

Another objectionable aspect of the government's proposal is its suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation.[60]  If the Filter Team determines that the documents are not privileged, the government proposes, then they will be "returned . . . to JTF-Guantánamo for appropriate action" – whatever that is.[61]  Such a review for privilege would leave "the government's fox . . . in charge of the [clients'] henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions" overriding legitimate claims of privilege.[62]

This part of the government's proposal is a patent attempt to chill attorney-client communications.  In it, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system."[63]  This unfounded

--------------------------------------------------

[59] *See, e.g., Savage supra* note 49, at A1.

[60] Resp. Mot. at 11.

[61] *Id.*

[62] *In re Grand Jury Subpoenas*, at * 10.

[63] Resp. Mot. at 18.

speculation is a veiled threat to habeas counsel, designed to deter them from communicating effectively with their clients. Indeed, in a footnote, the government lifts the veil: "if such prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[64] These threats constitute an insult to the hundreds of distinguished attorneys who have taken on the *pro bono* representation of the Guantánamo prisoners. As counsel in a matter involving access to classified information, we are well aware that we are subject to possible contempt and criminal actions, and we take our obligations under the Protective Order very seriously. As the Court has reminded the government, "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[65] In the absence of specific, individualized evidence that we have breached these obligations, there is absolutely no warrant for a team of government lawyers to begin rifling through Mr. Al-Shabany's legal papers on a fishing expedition for purported violations.

A third objectionable aspect of the proposed Filter Team process is its lack of transparency. As described by the government, the Filter Team is not under any obligation to identify for counsel which documents have been seized, which documents are under review, and which documents the Filter Team has deemed non-privileged. In short, we are asked simply to trust that the Filter Team is doing its job and have no mechanism for challenging its methods or designations. Obviously, this is unacceptable.

---

[64] Resp. Mot. at 11 n.10.

[65] *Al Odah*, 346 F. Supp. 2d at 14.

IV.   **IN THE ALTERNATIVE, PETITIONERS SHOULD BE PERMITTED TO UNDERTAKE LIMITED DISCOVERY, AND ANY FURTHER REVIEW OF MR. AL-SHABANY'S LEGAL PAPERS SHOULD BE CONDUCTED BY THE COURT OR A SPECIAL MASTER.**

As an alternative remedy, we ask that the Court permit Petitioners to undertake limited discovery to explore the circumstances surrounding the seizure of Mr. Al-Shabany's legal papers and to cross-examine the fact witnesses whose declarations have been filed in support of the government's motion.[66]

If, on the basis of facts learned through discovery, the Court determines that further review of some of Mr. Al-Shabany's legal papers is appropriate, we respectfully ask that (i) such review be precisely tailored to address only the issues deemed valid by the Court, while protecting the privilege as much as possible, and (ii) the Court or a special master, but in no event a Department of Defense Filter Team, conduct such a review.

---

[66] Although this case is currently stayed, the stay did not prevent the government from proceeding with its motion, and it should not prevent discovery related to that motion.

- 24 -

# CONCLUSION

For the foregoing reasons, Respondents' motion should be denied, and Petitioners'

motion should be granted.

Dated: Washington, D.C.
       July 24, 2006

                                   Respectfully submitted,
                                   Counsel for Petitioners:

                                   /s/ Paul A. Leder
                                   RICHARDS SPEARS KIBBE & ORBE LLP
                                   Brian S. Fraser (SDNY No. BF-0114)
                                   Christopher W. Dysard (SDNY No. CD-0002)
                                   Marcellene E. Hearn (SDNY No. MH-6050)
                                   R. Zachary Gelber (SDNY No. RG-9346)
                                   One World Financial Center, 29th Floor
                                   New York, New York  10281
                                   Tel: (212) 530-1800
                                   Fax: (212) 530-1801

                                   Paul A. Leder (DC 358597)
                                   1775 Eye Street NW
                                   Washington, D.C.  20006
                                   Tel: (202) 261-2960
                                   Fax: (202) 261-2999

                                   *Of Counsel*
                                   Barbara Olshansky (SDNY No. BO-0057)
                                   Gitanjali S. Gutierrez (SDNY No. GG-1234)
                                   CENTER FOR CONSTITUTIONAL RIGHTS
                                   666 Broadway, 7th Floor
                                   New York, New York  10012
                                   Tel: (212) 614-6439
                                   Fax: (212) 614-6499